[Cite as *State v. Boyd*, 2022-Ohio-3523.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

ROBERT BOYD,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 20 MA 0131

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2017 CR 1381

**BEFORE:**
Carol Ann Robb, Gene Donofrio, Cheryl L. Waite, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Paul J. Gains,* Mahoning County Prosecutor, *Atty. Ralph M. Rivera,* Assistant Chief, Criminal Division, Office of the Mahoning County Prosecutor, 21 West Boardman Street, 6th Floor, Youngstown, Ohio  44503 for Plaintiff-Appellee and

*Atty. Edward F. Borkowski, Jr.* P.O. Box 609151, Cleveland, Ohio 44109 for Defendant-Appellant.

Dated:  September 30, 2022

**Robb, J.**

**{¶1}** Defendant-Appellant Robert Boyd appeals after being convicted of rape and other offenses in the Mahoning County Common Pleas Court. He sets forth arguments related to the denial of his suppression motion, sufficiency of the evidence, weight of the evidence, ineffective assistance of counsel, and sentencing. For the following reasons, the trial court's judgment is upheld and Appellant's convictions are affirmed.

## STATEMENT OF THE CASE

**{¶2}** Appellant was indicted on two counts of rape for purposefully compelling two victims to submit to sexual conduct by force or threat of force. *See* R.C. 2907.02(A)(2),(B) (first-degree felonies). Count one related to anal sex with victim A, who was 17 years old at the time of the March 31, 2017 incident. Count two related to anal sex with victim B, who was 14 years old at the time of an April 17, 2016 incident. As to victim B, Appellant was also charged with gross sexual imposition for touching this boy's penis by force or threat of force. *See* R.C. 2907.05(A)(1),(C) (fourth-degree felony).

**{¶3}** Three counts of disseminating matter harmful to juveniles were brought based on Appellant's texting of photographs of his penis to victim C, who was 16 years old at the time of the March 2017 communications. *See* R.C. 2907.31(A)(1),(F) (first-degree misdemeanors). Appellant was also charged with nine counts of illegal use of a minor in nudity-oriented material for possessing or viewing certain photographs found on a hard drive during the execution of search warrants at his residence. *See* R.C. 2907.323(A)(3),(B) (fifth-degree felonies).

**{¶4}** Appellant filed a motion to suppress evidence seized during the search of his Instagram account and the later search of his residences. The affidavits and warrants issued on 4/5/17 and 5/12/17 were admitted at the suppression hearing and are reviewed in detail in assignment of error one. The trial court denied the suppression motion. (11/27/2019 J.E.).

**{¶5}** After a jury trial, Appellant was convicted on all counts with the exception of count four (one of the three disseminating charges). The testimony presented at trial is reviewed where relevant within assignments of error two, three, and five (which address

sufficiency of the evidence, weight of the evidence, and ineffective assistance of counsel). As discussed further in assignment of error five, Appellant was sentenced to maximum consecutive sentences for two rapes and gross sexual imposition and a combination of concurrent and consecutive sentences for the other offenses, for a total sentence of 24.5 years. He filed a timely notice of appeal from the December 2, 2020 sentencing entry.

ASSIGNMENT OF ERROR ONE: SUPPRESSION

{¶6} Appellant sets forth five assignments of error, the first of which alleges:

"THE TRIAL COURT ERRED BY OVERRULING APPELLANT'S MOTION TO SUPPRESS."

{¶7} The Fourth Amendment to the United States Constitution provides that, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The exclusionary rule was judicially created to safeguard Fourth Amendment rights. *State v. Hoffman*, 141 Ohio St.3d 428, 2014-Ohio-4795, 25 N.E.3d 993, ¶ 24, citing *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). By Ohio rule, a request for a search warrant must be accompanied by a sworn affidavit "establishing the grounds for issuing the warrant." Crim.R. 41(C)(1). A search warrant will be issued if the judge finds probable cause for the search exists based on the information in the affidavit. Crim.R. 41(C)(2) ("The finding of probable cause may be based upon hearsay in whole or in part, provided there is a substantial basis for believing the source of the hearsay to be credible and for believing that there is a factual basis for the information furnished.").

{¶8} "An affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause * * *." *Illinois v. Gates*, 462 U.S. 213, 239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In evaluating probable cause in an affidavit submitted in support of a search warrant, the duty of the judge or magistrate issuing the warrant is to consider all of the circumstances in the affidavit and "make a practical, common-sense decision" as to whether there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238-239. "The probable-cause standard is incapable of precise definition or quantification into percentages

because it deals with probabilities and depends on the totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 370-71, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003).

**{¶9}** The court evaluates the nexus between the alleged crime and the objects to be seized or the place to be searched. *State v. Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, 46 N.E.3d 638, ¶ 34. The affiant can make reasonable inferences, and the facts behind any significant inferences should be disclosed to the issuing judge, who can make their own inferences. *Id.* at ¶ 39-41.

**{¶10}** The probable cause decision examining the totality of the circumstances is entitled to great deference and doubtful cases must be resolved in favor of upholding the warrant. *State v. Jones*, 143 Ohio St.3d 266, 2015-Ohio-483, 37 N.E.3d 123, ¶ 13-14. Search warrant affidavits "must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area." *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965).

**{¶11}** Upon the establishment of probable cause in the affidavit, the aforequoted Fourth Amendment also states the warrant must set out the scope of the authorized search with particularity. *Payton v. New York*, 445 U.S. 573, 584, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). The purpose of requiring the search warrant to "particularly describe the place to be searched and the persons or things to be seized" is to avoid "wide-ranging exploratory searches." *Maryland v. Garrison*, 480 U.S. 79, 84, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987). "In search and seizure cases where a warrant is involved, the requisite specificity necessary therein usually varies with the nature of the items to be seized. Where, as here, the items are evidence or instrumentalities of a crime, it appears that the key inquiry is whether the warrants could reasonably have described the items more precisely than they did." *State v. Benner*, 40 Ohio St.3d 301, 307, 533 N.E.2d 701 (1988). Even a search warrant with broad categories of items to be seized is proper when the description is as specific as the criminal activity being investigated allows. *Castagnola*, 145 Ohio St.3d 1 at ¶ 80.

**{¶12}** Appellant initially contests the denial of his suppression motion related to the Instagram warrant. He contends the affidavit to obtain the search warrant for his

Instagram account lacked probable cause and the warrant was overbroad by authorizing a general exploratory search.

{¶13} The affidavit for the Instagram warrant explained the investigation began when a father called the Boardman police to report finding an Instagram message on his 15-year-old son's phone suggesting he regularly bought tobacco products from Appellant. The father saw the following message from another juvenile to his son: "if you got 10 lets go Bobs and get a blizzy." (The father explained this is what his son called a black and mild cigar.) When the father responded while pretending to be his son, he discovered Robert Boyd had been providing alcohol and tobacco to juveniles at his residence in Boardman and other locations.

{¶14} On April 3, 2017, the school resource officer (a Boardman police sergeant) met with the juvenile (who is not one of the victims in this case). The juvenile admitted Appellant provided him with alcohol and tobacco and additionally reported that at the beginning of March 2017, Appellant asked via Instagram if he could give the juvenile a "blowjob" (and then asked the juvenile to delete the message after his request was rejected). It was noted that Appellant's Instagram username (robertboyd5515) was Appellant's first and last name combined with the street address at his house on West Boulevard. The police were provided with screenshots of conversations between this username and the reporting juvenile.

{¶15} On March 18, 2017, the juvenile asked Appellant for a "favor" by stating: "All I have is a dollar and I really need a black and mild" and "I'd ask for a pack but I don't have enough to get u back." Appellant arranged to meet the juvenile at a gas station, telling him to "jump in the mustang so no one sees me giving it to ya" after noting, "You showed me you can keep a secret."

{¶16} On March 22, 2017, the juvenile asked for "blacks with that bottle, I got money for em, don't forget what the bottle is for lol." Appellant asked, "No school tomorrow?" The juvenile disclosed he had been expelled, and Appellant arranged to meet him at a certain address.

{¶17} On March 28, 2017, Appellant reminded the juvenile, "Delete our messages here." The juvenile responded, "I do. I'm broke but I really need a black." Appellant replied, "Messages aren't deleting here. Thats weird." Appellant then instructed him how

to delete the messages. (Appellant also tried to direct the child to Snapchat, which would automatically delete each message once read.)

{¶18} Other screenshots showed conversations wherein the juvenile disclosed to his friend: he has been trying to "get wit me"; he "asked me to let him suck my dick"; "he wont stop trying"; "he dropped off the bottle and snapped me and said damn ur so fine"; and "He keeps asking me for dick pics." In one message, the reporting 15-year-old juvenile explained: "it started with him saying I've heard a rumor you let [someone] suck u off"; "I was like bob wym and he said doing that to u would be interesting and I said nah bob"; "he just started asking me to keep it a secret and shit and all that, but all the time he snaps and dms me"; "he might be a pedophile but he do be getting me free shit like all the time and he's always given me rides and shit, he bought me that bottle * * * and gave me a pack of blacks for free"; and "he'll just be like having a normal convo and then outa no where start saying shit about my dick and how he wants to gimme head and make me relax."

{¶19} The friend (whose identity the police confirmed) disclosed in a message, "he asked me for a threesome with my best friend and then he asked me for nudes and one time I asked him for a ride and he told me if I clean his house naked that he would help me." This friend also said, "U know he literally had sex with this one guy at our school?"

{¶20} Based upon the above-recited evidence, the affiant attested to believing Appellant provided alcohol and tobacco products to juveniles on multiple occasions, encouraged the deletion of evidence, and solicited sex from juveniles online. The resulting search warrant for the Instagram records of robertboyd5515 was limited to the time period of February 1, 2017 through April 4, 2017. The warrant said it was to search for messages to be used in the prosecution of the offenses of sale of liquor to underage persons, contributing to the delinquency of a minor, unlawful sexual conduct with a minor, and importuning. In addition to seeking messages and photos, the warrant asked for location and identifying information.

{¶21} The affidavit clearly set forth a substantial basis for finding there was a fair probability evidence of various crimes would be found within the Instagram account of robertboyd5515. They had screenshots of incriminating conversations between that

account and a 15-year-old. Additionally, this child specifically told the police Appellant asked if he could provide oral sex to the juvenile (who was under the age of sexual consent), and the child confirmed Appellant provided him with alcohol and tobacco products. Conversations between this child and a friend showed the child was complaining of the conduct before his father interceded. The probability of finding evidence of illegal conduct, including attempts, did not apply to just this child. Another juvenile acknowledged to the reporting juvenile in preserved messages he or she had a similar experience with Appellant requesting nude photos, proposing the exchange of services (a ride for nude cleaning), and asking for sex via a threesome. In addition, the reporting juvenile's father saw a message from another juvenile encouraging his son to go with him to "bobs" to buy tobacco products. Under the totality of the circumstances, there was probable cause for the issuance of a search warrant for the Instagram account for the limited date range.

{¶22} Contrary to Appellant's contention, the resulting search warrant was not overbroad. It sought messages and photos from an Instagram account during a limited two-month period surrounding the screenshots and asked for associated information in order to confirm the identity of the user. The warrant listed the crimes for which the evidence would be used if found. The police would not have been able to find messages related to the crimes being investigated without reading the messages provided by Instagram. They were not required to have Instagram screen the messages for them or only seek messages involving the reporting juvenile (who showed them some of the messages he received from Appellant). The warrant was as specific as the circumstances allowed. *See Benner*, 40 Ohio St.3d at 307.

{¶23} As to subsequent warrants allowing the search of devices at Appellant's residences, Appellant initially sets forth an argument that is dependent on the above arguments. That is, he argues if his Instagram suppression argument is sustained, then the later warrants should be invalidated as the fruit of the poisonous tree because the later affidavits partially relied on the results of the Instagram warrant. As the suppression arguments on the Instagram warrant are without merit, Appellant's initial argument on the subsequent warrants fails as well.

**{¶24}** Next, Appellant contends the affidavit for the search of devices at his residences lacked probable cause because it included old or irrelevant events and there was no nexus between the crime alleged and the things to be seized. He also complains the search warrant lacked specificity and thus allowed a "fishing expedition" on his entire electronic life.

**{¶25}** On May 11, 2017, a month after the Instagram warrant was issued, a search warrant was issued for each of Appellant's residences in Boardman. The affidavit in support of each warrant pointed out he moved to the Lockwood Boulevard residence after his West Boulevard residence suffered a fire in November 2016.[1] The affiant first reviewed the facts contained in the April 2017 affidavit for the Instagram warrant. Next, Appellant's arrest history was recited as including harassment, unauthorized use of a motor vehicle, unlawful restraint, assault, and domestic violence (in 2008, 2009, and 2017). Previous investigations were also reviewed.

**{¶26}** According to the affidavit, a 2013 investigation was initiated when a 14-year-old friend of Appellant's son reported Appellant showed him photographs on a computer of young boys (estimated to be six to eight years old) in "skimpy clothes" and said he wanted to take a similar photograph of him. When the boy lifted up his shirt, Appellant asked him to turn around and took a picture of his bare back. The boy said Appellant then pulled down the top of his shorts and underwear to expose the top of his buttocks for the next photograph. The boy also reported Appellant gave him a ride during which Appellant offered to give the boy a massage to help him relax.

**{¶27}** Appellant told the police he merely offered the use of a massage chair and denied showing the boy inappropriate photographs. He admitted taking shirtless photographs of the boy but denied pulling down his shorts. He told the police he deleted the photographs. After being instructed by the police not to contact the boy or his family, Appellant contacted the boy's mother and offered to show her *one* of the photographs (which he told the officer he deleted). The photograph showed the boy shirtless from the back (his buttocks were not visible).

---

[1] It was acknowledged the affidavits and warrants for each residence was the same except for the address. We will thus refer to affidavit and warrant in the singular when discussing the residential search.

Case No. 20 MA 0131

{¶28} In addition, a Children Services investigation was initiated in 2016 when Appellant's adopted son reported during a group counseling session that he had a flashback of being forced to perform oral sex on his adoptive father when he was seven or eight years old. He also said Appellant tried to take photographs of his friend without pants. Appellant denied the oral sex incident to a caseworker and said he showed the photographs of the friend to the police and the boy's parents (which was false as he only showed one photograph). The caseworker was unable to speak to Appellant's son again until he appeared in juvenile court with his father. When she interviewed the son, he altered his story. He said he remembered "someone" performed oral sex on him but came to believe it may have occurred before he was adopted; he also said he sometimes believed it was just a dream.

{¶29} The search warrant affidavit also noted at the time of the November 2016 fire, a 16-year-old friend of Appellant's son was staying with Appellant, even though his son was living at a rehabilitation center. It was additionally disclosed police made contact with Appellant in January 2017 after his daughter was repeatedly truant. They found her at a motel where she intended to meet a registered sex offender.

{¶30} A few days later, Appellant contacted the police to say a juvenile he allowed to stay with him before the fire was heavily using drugs and was associated with four other juveniles whom he also believed were using drugs. One of these juveniles (age 15) was questioned by police in March 2017 for a noise complaint and said he obtained fireworks from Appellant's residence. After messages were recovered with the Instagram warrant, the police saw a message from this juvenile to Appellant asking, "Can you come get me and [other juvenile] and we can [emojis of open mouth and fireworks]." (An officer opined this emoji combination represented oral sex.)

{¶31} The Instagram warrant also led the police to messages between Appellant and a 17-year-old boy. The conversations included discussions about sex acts and the 17-year-old asking how he could make money. Appellant advised the juvenile to delete his messages and attempted to direct him to Snapchat. Appellant's first recovered message to this juvenile was a sad face with the message, "if you weren't interested you just needed to tell me. I still would have helped you with finding work and that to help you out." Later, Appellant asked, "Does that mean your still interested in a bj?"

{¶32} In other conversations, the 17-year-old asked, "What is the fastest way to make $375? Appellant replied, "Legally?" The juvenile responded, "ANY WAY. I NEED THE MONEY." The juvenile said: he wanted to buy his dream camera; he had no job; and he could not afford to get his driver's license. When he again asked how to make money, Appellant said, "There really is no shortcut to money other than work."

{¶33} Appellant talked about meeting the 17-year-old at his "other house" which he described as the "One im working on" and as being located "2 blocks from current house." They discussed whether they should just park the car somewhere, and Appellant asked the juvenile if he was into "Top, bottom, etc?" He also asked if the juvenile had "any other pics." Appellant's messages said he mapped the address in his phone to the juvenile's residence thirty minutes away and later indicated Appellant was on his way to retrieve the juvenile. Two hours later, Appellant texted, "Just got home" and "Did you have fun?" The juvenile did not respond. The juvenile's Facebook account was open to the public, and the police learned he purchased the desired camera for $375 after his meeting with Appellant.

{¶34} The affiant further explained the IP addresses captured by Instagram were associated with Appellant's house on Lockwood Boulevard and a cell phone. The phone was registered to Appellant's juvenile son, but Appellant provided that phone's number to police as his personal number when they arrested his daughter on May 3, 2017. At that time, police officers noticed three desktop computers, a laptop, and several cell phones.

{¶35} The affiant referred to the offenses of importuning and contributing to the delinquency of a minor with alcohol and tobacco, citing to the juvenile's report that instigated the prior Instagram warrant and to the conversations with other juveniles discovered from that warrant. The affiant also referred to the potential for finding communications with juveniles and the probability Appellant paid a juvenile for sex. The affiant further emphasized Appellant's pattern of grooming children, noting the technique is used by sex offenders to gain trust, test secret-keeping, and make the child a willing participant. The affiant concluded by stating he believed Appellant possessed at his residence phones, computers, and drives which could be used to store child pornography or communications on child pornography or child exploitation. Permission was requested

to preview the devices at the scene to avoid power disconnection (which also served to limit the amount of devices eventually seized).

**{¶36}** The search warrant listed some of the offenses being investigated: sale of liquor to an underage person, contributing to the delinquency of a minor, unlawful sexual conduct with a minor, and importuning.[2] The warrant found probable cause to believe there was evidence relevant to the crimes being investigated at the residences, including on cell phones, security DVRs, computers and drives which could be used to store child pornography, and records of communications on the topic of child exploitation or contributing to the delinquency of a minor.

**{¶37}** During the execution of the search warrant, BCI agents prescreened various devices. From the seized devices, the trial evidence was recovered from: Appellant's cell phone (which contained the photographs of Appellant's penis sent to victim C, constituting the misdemeanor charges of disseminating matter harmful to juveniles); and a hard drive (which contained the nine photographs of nude pre-pubescent children, constituting the charges of illegal use of a minor in nudity-oriented material).

**{¶38}** Regarding the warrants allowing the search of his devices, Appellant says the trial court failed to specifically determine whether there existed a nexus between the crimes alleged and the things to be seized and claims some of the evidence was stale. In determining whether there was fair probability that evidence of a crime will be found in a particular place, some considerations include "how stale the information relied upon is when the facts relied upon occurred, and whether there is a nexus between the alleged crime, the objects to be seized, and the place to be searched." *Castagnola*, 145 Ohio St.3d 1 at ¶ 34-35.

**{¶39}** Appellant's allegation of stale evidence cites the recitation in the affidavit regarding the 2013 investigation, which started when a 14-year-old reported Appellant showed him photographs of very young, skimpily-dressed boys on his computer and took

---

[2] Unlawful sexual conduct with a minor occurs when an adult has sexual conduct with a 13 to 15 year old. R.C. 2907.04(A). Importuning includes the situation where an adult solicits a 13 to 15 year old to engage in sexual conduct, when the offender is four or more years older, whether or not the offender knows the age of the other person. R.C. 2907.07(B)(1), (D)(1) (or telecommunications device solicitation of 13 to 15 year olds and reckless as to age). We also note the offense of compelling prostitution includes knowingly inducing or soliciting a minor (under 18) for sex for hire regardless of knowledge of age; compulsion is not actually an element where a minor is a victim. R.C. 2907.21.

a photograph of the boy's bare back and then the top of the boy's buttocks. Appellant's staleness argument also includes the recitation in the affidavit about his son's 2016 disclosure at a group counseling session that he had a flashback that his adoptive father forced him to perform oral sex on him when he was younger.

{¶40} It was not improper to set forth various prior investigations in a search warrant to show pattern or escalation in a new child-related investigation involving sexual requests. This was by no means the only evidence to support the warrant seeking evidence of child pornography or child exploitation from Appellant's devices during an investigation which included the provision of alcohol and tobacco products to children. A child under the age of 16 had recently reported Appellant solicited him for sex. And, Appellant repeatedly asked the child for illegal photographs of his penis, all while Appellant was supplying this minor with alcohol and tobacco products. The police also saw a communication from a different juvenile asking this child if he had money so they could go to Appellant's residence to buy tobacco and a communication from another juvenile who claimed to have been propositioned by Appellant for sex with allusions to an exchange of services.

{¶41} Then, from the results of the Instagram warrant, the police gained probable cause to believe Appellant induced a different minor to have sex for hire in the same time period. Appellant discussed this occurring at his house, and the police had prior information on Appellant's use of security cameras within the house. Again, it is the totality of the circumstances set forth in the warrant that a trial court considers in determining probable cause for a warrant. A court need not evaluate each piece of evidence and reject it if it would not provide probable cause by itself.

{¶42} After the trial court found the search of the Instagram account was supported by probable cause and conducted pursuant to a warrant that was not overbroad, the court then concluded the evidence found as a result of the Instagram warrant led to additional evidence that established probable cause for the search of the residences. The finding of probable cause implicitly contained a finding of a sufficient nexus. And, there was in fact a nexus between the criminal activity being investigated and the place to be searched when considering the totality of the circumstances, including

Case No. 20 MA 0131

the nature of the evidence.  *See State v. Dennison*, 2018-Ohio-5126, 125 N.E.3d 257, ¶ 22-26 (7th Dist.).

{¶43}  Various offenses regarding minors were at issue, and Appellant's conduct of seeking illegal images from minors by communicating with them online was related even to the initially reported offenses of providing alcohol and tobacco to minors.  A device such as Appellant's phone or computer (with a hard drive) would have been the method of communication and the place where electronic images involving child pornography or exploitation (including soliciting) could be stored, which was all relevant to the offenses under investigation.  The warrant specified the types of files to be seized.  *See State v. Waters*, 8th Dist. Cuyahoga No. 103932, 2017-Ohio-650, ¶ 16 (finding search of electronic storage devices was not overbroad or insufficiently particularized while searching for child pornography).  In evaluating the totality of the circumstances, we point to our above review of both the affidavit in support of this warrant for the search of devices and our review of the affidavit in support of the Instagram warrant (as this information was restated within the subsequent affidavit).

{¶44}  We also point out our situation is distinguishable from *Castagnola* where: the police were investigating vandalism of the prosecutor's vehicle; a detective claimed the defendant said he looked up the address online; the warrant authorized a search of all electronic storage devices without saying what they were looking for besides listing offenses under investigation regarding the damage; and the agents searching the computers opened image files and found child pornography.  *Castagnola*, 145 Ohio St.3d 1.  The *Castagnola* defendant pointed out the police had no knowledge he had a computer when the warrant was issued, and the detective merely inferred the defendant looked up the prosecutor's address online (falsely portraying that the defendant said he found the address online).  *Castagnola*, 145 Ohio St.3d 1 at ¶ 16, 41 ("a magistrate cannot be viewed as neutral and detached if the magistrate issues a search warrant that is unknowingly based on the police officer's conclusions"), 59 (finding "based on the totality of the circumstances, that there was no probable cause to believe that a computer in Castagnola's residence was used in furtherance of the alleged crimes").

{¶45}  Here, the police saw many computers and phones at Appellant's residence mere days before the device warrant, they knew he used an electronic device to

communicate with the juveniles, and there are no allegations of false statements or inferences improperly framed as facts. Rather, the trial court was left to make the reasonable inferences. Moreover, in our case, the offenses being investigated specifically involved child exploitation and pornography, and the warrant described the parameters of the electronic device search as looking for these categories of files. *Compare id.* at ¶ 76-77. We recently rejected an argument claiming a warrant lacked specificity where it instructed the officers to search a computer and seize evidence relating to sexual offenses involving juveniles (listing unlawful sexual conduct with a minor, importuning, disseminating matter harmful to juveniles, and pandering sexually oriented matter involving a minor). *State v. Bugno*, 7th Dist. Mahoning No. 20 MA 0030, 2022-Ohio-2008, ¶ 39-41.

**{¶46}** The warrant in the case at bar guided the judgment of the searchers and did not include items that should not be seized or call for a general exploratory search of the devices; rather, it described the items to be seized as best as could be done under the circumstances of this case and the nature of the activity. *See id.* at ¶ 79-80. The trial court's probable cause decision is entitled to great deference and doubtful cases must be resolved in favor of upholding the warrant. *Jones*, 143 Ohio St.3d 266 at ¶ 13-14. We conclude the trial court had substantial evidence from which to conclude there was a fair probability that messages or images evidencing child pornography or child exploitation would be found on Appellant's devices.

**{¶47}** Finally, Appellant contends if his arguments have merit, then the good faith exception would not apply to save the searches. "Under the good-faith exception, evidence obtained during a search conducted pursuant to a warrant that is unsupported by probable cause will not be excluded if the officers who obtained the evidence acted reasonably in relying on the warrant." *State v. Dibble*, 159 Ohio St.3d 322, 2020-Ohio-546, 150 N.E.3d 912,¶ 9 (listing four examples where this exception will not apply), citing *United States v. Leon*, 468 U.S. 897, 924-925, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Relying on the third example, Appellant says the warrants were based on affidavits "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *See id.* This inquiry has been discussed in combination with the second *Dibble* example, which objectively evaluates the totality of the circumstances and asks

whether "a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization."  *See Castagnola,* 145 Ohio St.3d 1 at ¶ 93, quoting *Leon,* 468 U.S. at 922 ("the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion").

**{¶48}** As this court finds the warrants were valid under the above analysis, this alternative argument need not be addressed.  In fact, it was not addressed by the trial court, as the trial court upheld the warrants and did not render an alternate opinion. Appellant's first assignment of error is overruled.

ASSIGNMENT OF ERROR TWO:  SUFFICIENCY

**{¶49}** Appellant's second assignment of error contends:

"APPELLANT'S CONVICTIONS WERE UNSUPPORTED BY SUFFICIENT EVIDENCE."

**{¶50}** Whether the evidence is legally sufficient to sustain a conviction is a question of law dealing with adequacy.  *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).  An evaluation of witness credibility is not involved in a sufficiency review, as the question is whether the evidence is sufficient if taken as true.  *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79, 82; *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001).  In other words, sufficiency involves the state's burden of production rather than its burden of persuasion. *Thompkins*, 78 Ohio St.3d at 390 (Cook, J., concurring).

**{¶51}** In reviewing the sufficiency of the evidence, the court views the evidence in the light most favorable to the prosecution to ascertain whether a rational juror could have found the elements of the offense proven beyond a reasonable doubt.  *State v. Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998).  *See also State v. Filiaggi*, 86 Ohio St.3d 230, 247, 714 N.E.2d 867 (1999) (reasonable inferences are also viewed in favor of the state); *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (all of the evidence is to be considered in the light most favorable to the prosecution, including reasonable inferences).  The question is merely whether "any" rational trier of fact could have found the contested elements were adequately established.  *State v. Getsy*, 84 Ohio St.3d 180, 193, 702 N.E.2d 866 (1998), quoting *Jackson*, 443 U.S. at 319.

{¶52} First, Appellant challenges the sufficiency of the evidence to support count one, the rape of victim A. The elements of this offense are purposefully compelling another to submit to sexual conduct by force or threat of force. R.C. 2907.02(A)(2) (who is not the spouse). Appellant points out the age of sexual consent is 16 in Ohio, and victim A was 17 years old. Appellant contends there was not sufficient evidence of force or threat of force by emphasizing the following: the victim's acknowledgement he initially consented to anal sex; the lack of testimony on fear or threat; and the victim's testimony he did not try very hard to throw Appellant off him. The state points out rape can occur after consent is withdrawn and urges the victim testified to force.

{¶53} Victim A testified he communicated with Appellant after seeing his online photograph with a Lamborghini, which the victim believed belonged to Appellant. (Tr. 3131, 318). The victim testified he had a girlfriend but was curious. (Tr. 317). They talked about sex. On March 31, 2017, they decided to meet for a sexual encounter. (Tr. 318, 341). Appellant retrieved the victim from Lisbon and brought him to Taco Bell and then to his house which was still under construction from the fire. Before arriving at the house, the victim expressed he was starting to feel on edge and did not feel right about going. (Tr. 323). However, the victim "went along with it" and was thereafter initially accepting of trying the sexual encounter. (Tr. 360). The victim noticed security cameras around Appellant's house, which appeared to be recording. (Tr. 324).

{¶54} They went into the bedroom where Appellant laid him down and removed his pants. (Tr. 325). The victim was then bent over with his knees on the floor and his chest and stomach on the bed. (Tr. 345). Appellant began performing anal sex on the victim. Within five to ten seconds, the victim withdrew his consent. (Tr. 328, 344, 360). The victim testified, "I didn't like it at all; so I asked him to stop." (Tr. 326). He further testified: "it hurt * * * I just kept telling him don't. * * * I told him no, but he kept going anyway." (Tr. 327-328).

{¶55} When asked if Appellant physically restrained him, the victim said Appellant's arms were on his hands and arms, which were spread out. The victim noted, "I didn't try my hardest to get him off." (Tr. 328). When asked what he meant, the victim said, "I mean if I tried my hardest to - - to get away, I just would have fully got up, threw

him off me and left." He further explained, "I must have been in a state of shock." (Tr. 357-358).

**{¶56}** After five to ten minutes, Appellant ejaculated inside of the victim. (Tr. 328-329). When Appellant removed himself from the victim, the victim asked to go home. (Tr. 328). He noted he wished to exit the car as soon as he recognized where he was. (Tr. 329). He said Appellant told him not to tell anyone. (Tr. 330). He did not communicate with Appellant again. (Tr. 330). The victim said he tried to push the event out of his head and did not tell anyone about what happened until the police arrived at his door six weeks later to investigate Appellant (after the Instagram warrant). (Tr. 331-332). The victim said his drinking accelerated after the incident and he became an alcoholic. (Tr. 357).

**{¶57}** Force is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). When evaluating force in the context of rape, relevant considerations may involve the age, size, strength, and relationship of the parties. *State v. Eskridge*, 38 Ohio St.3d 56, 58, 526 N.E.2d 304 (1988). When defense counsel asked about a shirtless photograph sent to Appellant, the victim said he worked out. (Tr. 337). The nurse practitioner who saw the victim six weeks after the incident testified he was 5'7" and 141 pounds. (Tr. 370). The victim was 17 years old while Appellant was 46 years old. The incident occurred in Appellant's house, and the victim was driven there by Appellant.

**{¶58}** The past and immediate history of consent may be relevant. *Eskridge*, 38 Ohio St.3d at 59. However, forcible rape is not foreclosed by the fact an encounter began as consensual. In a case cited by the state, the Second District observed:

> Evidence of consent * * * is not a static concept, though. Rape can be established when the two participants start the encounter on a consensual basis, "but the consent is revoked by words, actions or conduct that clearly communicates non-consent, the defendant fails to respect the change in consent, and purposely proceeds to engage in sexual conduct through force or threat of force evidenced by violence, physical restraint, or some type of coercive or threatening conduct that creates a belief or fear that physical force will be used if the victim does not consent."

*State v. Freeman*, 2d Dist. Greene No. 2020-CA-33, 2021-Ohio-734, ¶ 42.

**{¶59}** The victim may have initially consented to the sexual encounter but within seconds, he felt pain and asked Appellant to stop. Despite his repeated requests for Appellant to stop, Appellant continued imposing anal sex upon the juvenile victim while pressing the victim's hands and arms into the bed as the victim was face down with his legs over the edge of the bed.

**{¶60}** Notably, the rape statute specifically states: "A victim need not prove physical resistance to the offender in prosecutions under this section." R.C. 2907.02(C). A rational juror could find Appellant engaged in purposeful conduct which satisfied the definition of force, which merely requires "any" compulsion or constraint physically exerted by "any" means. R.C. 2901.01(A)(1).

**{¶61}** Next, Appellant contends there was insufficient evidence to support counts five and six, the misdemeanor counts of disseminating matter harmful to juveniles. (Appellant was acquitted of the count four disseminating charge.) The pertinent statutory division states: "No person with knowledge of its character or content, shall recklessly do any of the following: (1) Directly sell, deliver, furnish, disseminate, provide, exhibit, rent, or present to a juvenile * * * any material or performance that is obscene or harmful to juveniles * * *." R.C. 2907.31(A)(1),(F) (first-degree misdemeanor if the material is harmful; felony if the material is obscene). The state agrees the mental state of recklessness also applies to the recipient's status as a juvenile.

**{¶62}** "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C). "A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist." *Id.* This "likely" mental state for recklessness merely involves "good reason for expectation or belief" (and is easier to show than the higher "probably" mental state). *State v. Young*, 8th Dist. Cuyahoga No. 85224, 2005-Ohio-3584, ¶ 17, citing Staff Note to R.C. 2901.22(C).

**{¶63}** The indictment alleged these counts occurred on or about March 14, 2017. The investigating officer testified that after seizing Appellant's cell phone while executing the search warrant at the residence in May 2017, he discovered Appellant texted

Case No. 20 MA 0131

photographs of his penis to a juvenile. (Tr. 590). The officer testified these photographs were sent in March of 2017 (and said he could look at the printout of the text history to check the day of the month). (Tr. 556-557). When the police confronted Appellant about the texted photographs, Appellant voiced his mistaken belief it was legal because the minor was 16 (apparently assuming the law on sexual conduct applied to disseminating). (Tr. 573).

{¶64} Victim C testified he was 16 years old when he responded to Appellant's Craigslist advertisement, which was captioned to suggest Appellant was looking for a homosexual encounter. They originally used both email and texts, exchanging photographs of their genitals and making plans to meet. (Tr. 389-393, 399-402, 408). While testifying, the juvenile recipient reviewed the recovered March 2017 texts sent to him by Appellant and identified two photographs of Appellant's penis and two photographs of Appellant's shirtless torso. (Tr. 394, 400-402); (St.Ex. 15-18).

{¶65} While viewing the printout of recovered texts, victim C also testified he told Appellant he was only 16 in a March 29, 2017 text. (Tr. 412). Appellant responded to the age disclosure by texting: "High school, then"; "16 is legal in Ohio"; and "I don't mind the age." (Tr. 404). They met for their second sexual encounter after the text about being 16. (Tr. 409). The juvenile recipient believed they exchanged photographs again after this disclosure, but he also seemed to indicate the state's packet of evidence contained all the photographs he received from Appellant (and the recovered photographs were sent before the disclosure). (Tr. 411, 413).

{¶66} Appellant's sufficiency argument revolves around his contention there was no evidence he was reckless as to the recipient's age of 16 because the recipient testified he initially told Appellant he was 19 years old. (Tr. 391). As the state points out, the victim told Appellant he did not have a driver's license, he was in school, and he lived with his family. (Tr. 396). Notably, Appellant previously spent time with the victim in person when they met for a sexual encounter in late 2016. (Tr. 392). The jury saw a photograph the juvenile sent to Appellant depicting what the juvenile looked like in March 2017, when Appellant sent the juvenile photographs of his penis. (St.Ex. 14); (Tr. 396-399).

{¶67} Circumstantial evidence and direct evidence inherently possess the same probative value, and intent is typically established by circumstantial evidence and

inferences as a person's intent rests in their mind. *State v. Treesh*, 90 Ohio St.3d 460, 485, 739 N.E.2d 749 (2001). Even if Appellant only sent photographs of his penis before the victim specifically disclosed his true age, a rational juror could find Appellant was reckless in believing the victim was 18 or older when he sent the photographs representing the two counts at issue.

{¶68} Appellant's final sufficiency argument contests the convictions for counts seven through fifteen, which arose from the nude photographs of children found on a hard drive during the execution of search warrants at Appellant's residence. The pertinent statutory elements of illegal use of a minor in nudity-oriented material are to possess or view any material that shows a minor who is not the person's child or ward in a state of nudity. R.C. 2907.323(A)(3) (unless an exception applies such as artistic, medical, or other proper purpose involving a person with a proper interest in the material or there is written consent of the parent). The mental state is recklessness. *State v. Young*, 37 Ohio St.3d 249, 252, 525 N.E.2d 1363 (1988), paragraph three of syllabus.

{¶69} In *Young*, the Ohio Supreme Court construed the statute as prohibiting the aforementioned nudity only "where such nudity constitutes a lewd exhibition or involves a graphic focus on the genitals * * *." *Id.* at 252, *rev'd on other grounds*, *Osborne v. Ohio*, 495 U.S. 103, 113-114, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990) (due process issue where jury was not instructed on scienter and qualifying nudity definition under new construction). "By limiting the statute's operation in this manner, the Ohio Supreme Court avoided penalizing persons for viewing or possessing innocuous photographs of naked children." *Osborne*, 495 U.S. at 113-114 (the state court was permitted to construe the statute in a constitutional manner to avoid a constitutional overbreadth challenge while allowing the statute to remain in full force as construed). The parties agree the trial court's jury instruction properly limited the statute's operation in the manner described by *Young* and *Osborne*.

{¶70} Appellant contends no rational person would find the nine photographs involved a lewd exhibition or a graphic focus on the genitals. Lewd has been generally defined as "sexually unchaste or licentious * * * lascivious * * * inciting to sensual desire or imagination * * *." *State ex rel. Rear Door Bookstore v. Tenth Dist. Ct. of Appeals*, 63 Ohio St.3d 354, 358, 588 N.E.2d 116 (1992), quoting *Webster's Third New International*

*Dictionary* 1301 (1986). According to dictionary.com, the definition of licentious includes: a throwing off of sexual restraint; lewd character or behavior; or wanton disregard or transgression of laws, rules, or moral norms. As for the graphic focus option, it has been concluded (in a case cited by the defense) there can exist a graphic focus on the child's genitals even where the rest of the child's body is in the picture. *State v. Jewell*, 2d Dist. Montgomery No. 16254 (Aug. 22, 1997).

**{¶71}** Appellant cites the testimony of the BCI agent who said she found "graphic images appearing to depict underage nudity" on Appellant's hard drive. (Tr. 296). While identifying the photographs for the record, she said the subject of each photograph was a naked juvenile and explained any identifying features in the photograph as follows: male holding a watermelon; female holding globe on top of her head; female; male holding a watermelon; female posing on a beach with a star drawn on her torso; female on a beach with a butterfly painted on her upper chest; female with a palm tree and water painted just above her pubic area; two females, one with a butterfly painted on her chest and one with a palm tree painted above her pubic area; and male holding two pool sticks with a triangle around his neck. (Tr. 298-299). Appellant concludes this was insufficient to establish the contested element.

**{¶72}** However, the nine photographs were provided for the jury's evaluation during the testimony and deliberations. (Tr. 297); (St.Ex. 9A-I). The witness was not required to supplement the jury's viewing by detailing the positions of the children, explaining how the focus seems to be on their genitals, opining the displays were meant to incite sexual imagination, or asserting they disregarded moral norms.

**{¶73}** The state reiterates the position espoused during trial. For instance, when responding to motion for acquittal on these charges, the prosecutor argued "there is a focus on the genitals" with "bare penises and testicles exposed, and vaginal areas that the lips are exposed" while noting the lack of pubic hair allowed one to "very graphically see those things." (Tr. 606). In addition, the prosecutor's closing argument to the jury asked, "when you look at these photographs, where do your eyes immediately go? To the exposed vaginas, to the breasts, to the penises sticking out. That is graphic focus on the genitals." (Tr. 736). We find these arguments are valid.

{¶74} The children were prepubescent children but not so young as to expect them to prance around naked on a beach or invite someone to play pool naked. The scenes were staged. Many of the children were posed in positions with techniques (such as the holding of props, lifting of arms, or spreading of limbs) meant to emphasize the genitals or constituting a lewd exhibition due to the arguable intent to incite sexual imagination (among certain viewers) by disregarding moral norms. The body paint applied to some of the female children emphasized their genitals and breasts (such as: a large star between and under the breasts with a face that was smiling and winking with its points/legs spread above the posed pubic area; a butterfly painted over the chest using the nipples as wing decorations with flowers trailing to the pubic area; and a palm tree from the hip to one breast with painted water extending all the way to the top of the upper labial fold).

{¶75} Even if one were to agree that it was a close case for some of the photographs, it cannot be said that no rational juror could find the photographs constituted a lewd exhibition or involved a graphic focus on the genitals. The matter is best addressed as a question of weight of the evidence, which is discussed under the next assignment of error. As a rational juror could find the contested elements of the various crimes proven beyond a reasonable doubt, this assignment of error is overruled.

ASSIGNMENT OF ERROR THREE:  WEIGHT

"APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶76} Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *Thompkins*, 78 Ohio St.3d at 387. The court evaluates the effect of the evidence in inducing belief, but weight of the evidence is not a question of mathematics. *Id.* A weight of the evidence review considers whether the state met its burden of persuasion. *Id.* at 390 (Cook, J., concurring) (as opposed to the burden of production involved in a sufficiency review). When a defendant claims the conviction is contrary to the manifest weight of the evidence, the appellate court is to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its

Case No. 20 MA 0131

way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, citing *Thompkins*, 78 Ohio St.3d at 387.

**{¶77}** "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact occupies the best position from which to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

**{¶78}** Where a case is tried by a jury, only a unanimous appellate panel can reverse on manifest weight of the evidence grounds. Ohio Constitution, Article IV, Section 3(B)(3). The power of the court of appeals to sit as the "thirteenth juror" is limited in order to preserve the jury's primary function of weighing the evidence. *Thompkins*, 78 Ohio St.3d at 389. Appellant separates his weight of the evidence arguments into four groupings.

**{¶79}** First, Appellant contests the weight of the evidence offered in support of the rape in count one. We discussed various facts concerning this offense in the prior assignment of error on sufficiency. Here, Appellant argues there was ample reason to doubt the veracity of victim A, emphasizing the following: the victim met with Appellant with intent to engage in sex; he consented to the initiation of anal sex that night; the victim said he did not try his hardest to get Appellant off of him; the victim did not report the rape until the police came to his house six weeks later; and the victim's statement to the police and to the Child Advocacy Center suggested the anal sex was non-consensual in its entirety, without indicating the anal sex began consensually.

**{¶80}** However, the jury did not clearly lose its way in weighing the evidence to determine if Appellant used force via "any violence, compulsion, or constraint physically exerted by any means" as defined by R.C. 2901.01(A)(1). The jury viewed victim A as he testified and was in the best position to ascertain his credibility. He said he told Appellant to stop more than once and Appellant refused to stop while holding his arms down. The victim explained he was in state of shock when asked why he did not attempt to throw

Appellant off, which is not a requirement for a victim in any event. R.C. 2907.02(C) ("A victim need not prove physical resistance to the offender"). The victim's testimony also indicated his lack of familiarity with the submissive physical position. Moreover, the jury heard Appellant testify at trial and could find his version of the night lacking in credibility. "When more than one competing interpretation of the evidence is available and the one chosen by the jury is not unbelievable, we do not choose which theory we believe is more credible and impose our view over that of the jury." *State v. Baker*, 7th Dist. Mahoning No. 19 MA 0080, 2020-Ohio-7023, ¶ 148, citing *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999).

**{¶81}** Second, Appellant contests the weight of the evidence to support the rape in count two and the gross sexual imposition in count three, which both related to victim B, who was 14 years old. The rape elements for count two were the same as in count one: purposefully compelling another to submit to sexual conduct by force or threat of force. R.C. 2907.02(A)(2). The elements of the charged gross sexual imposition were as follows: having sexual contact with another by purposely compelling the other to submit by force or threat of force. R.C. 2907.05(A)(1).

**{¶82}** Appellant admitted to committing the offense of sexual imposition against victim B by masturbating him four times over the course of a year, including on the night of the charged offenses against this victim. *See* R.C. 2907.06(A)(4) (sexual contact with a child who is thirteen years of age or older but less than sixteen years of age, whether or not the offender knows the age of such person, and the offender is at least eighteen years of age and four or more years older than such other person). In his testimony, Appellant denied using force or threats to make the victim submit to this touching and denied performing anal sex on the victim.

**{¶83}** Victim B testified Appellant would buy juveniles alcohol and cigarettes. (Tr. 447). On the night of April 16, 2016, when he was 14 years old, the victim went to Appellant's house with friends and smoked marijuana while the other boys drank alcohol. (Tr. 451). Appellant's children were not present (the daughter was not home and the son was away at a drug rehabilitation center). (Tr. 481-482). Appellant testified the juveniles came over to purchase marijuana from a stranger he let live in his house but claimed he did not know about the sales until later. (Tr. 620-622).

{¶84} The victim said two of the boys he was with beat him up and took his phone, forcing him to stay the night. (Tr. 450-451). Victim B said he eventually fell asleep in the living room where two boys were also sleeping. (Tr. 454). He awoke to find Appellant on top of him so that he could not move his hands; Appellant shushed the victim while pressing a hand to the victim's mouth. (Tr. 455-456). Victim B testified Appellant touched his penis while holding him down. (Tr. 457). He demonstrated where his hands were secured and explained Appellant used his legs to do so. (Tr. 490-491).

{¶85} Appellant removed the victim's pants and put the victim's penis in his mouth while pressing his body down. (Tr. 458). Victim B testified Appellant then turned him around holding his hands behind his back "like the police." After the victim felt something wet run down his backside, Appellant subjected the victim to anal sex. (Tr. 459-460). The victim said he tried to yell, but Appellant put his hand over his mouth and no one woke up. (Tr. 461). He testified: he could not move; all of Appellant's weight was on him; it hurt; and it "felt like forever." (Tr. 460, 497). After the incident, Appellant instructed him not to tell anyone and said he would hurt him if he told anyone. (Tr. 461, 467). The victim discovered he was bleeding from his anus and stayed in the bathroom for the remainder of the night. (Tr. 462-463).

{¶86} The next morning, the other boys beat him up again and pushed him in a creek. (Tr. 463-464). Appellant brought him home, and the victim's mother yelled at Appellant in the driveway. The victim disclosed the beatings by the juveniles to his mother, and she brought him to the hospital where a police report was filed against the juveniles, who were thereafter arrested. (Tr. 546). The investigating officer described the victim as timid and very small for his age. (Tr. 545). Photographs he took of the child in the hospital on April 17, 2016 were admitted.

{¶87} Days after Appellant was arrested in May of 2017, victim B attended a regular meeting with his juvenile probation officer at his school. The child was prohibited from going to Appellant's house as a term of his probation. When the probation officer mentioned Appellant, the child began crying. (Tr. 431-433). The child then disclosed that Appellant touched him a year ago. After this disclosure, the probation officer called the school resource officer who was involved in the investigation of Appellant supplying illegal products to minors, and the child disclosed the touching to this officer as well. (Tr. 470,

597). Victim B testified he was too nervous to tell them everything. (Tr. 469). He said he later disclosed the remainder of his story to the prosecution 1.5 years after his initial disclosure because it got easier to talk after the passing of time and because he felt like he could trust the prosecutors. (Tr. 471-472).

**{¶88}** The investigating officer acknowledged the victim stayed in communication with Appellant after the night of April 16, 2016 and was one of the minors Appellant was supplying with illegal products in 2017. (Tr. 599). Appellant's testimony also pointed to his friendly communications with victim B after the April 2016 encounter. (Tr. 644-645, 700).

**{¶89}** In arguing victim B's testimony lacked credibility, Appellant points out the victim's initial disclosure was consistent with Appellant's testimony. Appellant testified he first masturbated the victim while the other two juveniles were awake and watching a movie on the couch next to them. (Tr. 637). Nevertheless, he says it is unrealistic that the alleged events involving force could take place next to two sleeping juveniles as the victim testified. We note the testimony indicated the juveniles had been drinking alcohol. Moreover, the jury saw the emotional testimony from victim B and the testimony presented by Appellant. We cannot say they clearly lost their way in weighing the evidence and assigning credibility.

**{¶90}** Third, Appellant discusses counts five and six, disseminating matter harmful to juveniles, and argues the decision finding he was reckless as to the juvenile recipient's age was contrary to the manifest weight of the evidence. Appellant testified no photographs were exchanged after the recipient disclosed he was 16. He emphasizes the recipient answered Appellant's ad on Craigslist, which website requests the person replying to the ad be 18 years of age. However, this is not some major fact showing a sender was not reckless as to the age of the person to whom he sent photographs of his penis. Appellant testified he personally lied about his age all the time. (Tr. 671).

**{¶91}** We discussed additional evidence regarding these offenses in the prior assignment of error, including the recipient's disclosure to Appellant that he did not have a driver's license, lived with his family, and was in school. Furthermore, the jury viewed photographs the recipient sent to Appellant depicting how he looked at the time. Appellant's testimony also disclosed he had multiple ads and he realized in 2017 that this

recipient was the same person he personally met for a sexual encounter in 2016 (after the recipient responded to a different ad placed by Appellant). (Tr. 663). The photographs of Appellant's penis were sent to victim C months after their first sexual encounter.

**{¶92}** The jury did not clearly lose its way and create a manifest miscarriage of justice in finding Appellant reckless as to the recipient's status as a juvenile under R.C. 2903.31(A)(1). We additionally point out "mistake of age is not a defense to a charge under this section." R.C. 2907.31(C)(2) (except as provided in division (B)(3), which provides an affirmative defense if the material was harmful but not obscene and the juvenile presented false identification documents).

**{¶93}** Lastly, Appellant incorporates the arguments from his sufficiency assignment of error on counts seven through fifteen (illegal use of a minor in nudity-oriented material). He contends the jury should not have weighed the features of the photographs of naked children as constituting lewd exhibition or as involving graphic focus on genitals, which is the nudity test set forth in the Ohio Supreme Court's *Young* case and approved on appeal by the United States Supreme Court in *Osborne*. *See Young*, 37 Ohio St.3d 249; *Osborne*, 495 U.S. 103. We cite to the prior assignment of error for our discussion of the nine photographs.

**{¶94}** Even if some hypothetical juror could disagree and find certain photographs were not lewd exhibitions or were not graphically focused on genitals, we conclude the jury did not clearly lose it way and create a manifest miscarriage of justice in judging the photographs as fitting the definition set forth in *Young* and *Osborne*. This is not the "exceptional case where the evidence weighs heavily" against the jury verdict and requires this court to step in as the "thirteenth juror." *See Lang*, 129 Ohio St.3d 512 at ¶ 220. This assignment of error is overruled.

ASSIGNMENT OF ERROR FOUR:  SENTENCING

**{¶95}** Appellant's fourth assignment of error alleges:

"APPELLANT'S SENTENCE IS CONTRARY TO LAW."

**{¶96}** The court sentenced Appellant to the maximum of 11 years on each rape and the maximum of 18 months for gross sexual imposition to run consecutively. An additional one year was added to the sentence for the counts of illegal use of a minor in

nudity-oriented material; the court imposed concurrent 6-month sentences on two groupings to run consecutively. For these fifth-degree felony charges, six months was the lowest prison sentence available. *See* R.C. 2929.14 (with 12 months as the maximum). The aggregate sentence totaled 24.5 years. Appellant was also concurrently sentenced to 180 days in jail for the misdemeanor charges of disseminating matter harmful to juveniles.

**{¶97}** "The appellate court's standard for review is not whether the sentencing court abused its discretion." R.C. 2953.08(G)(2). Rather, the appellate court may only reverse an appealable sentence in favor of the defendant:

> if it clearly and convincingly finds either of the following:
>
> (a) That the record does not support the sentencing court's findings under
>
> division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section
>
> 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever,
>
> if any, is relevant;
>
> (b) That the sentence is otherwise contrary to law.

R.C. 2953.08(G)(2).[3]

**{¶98}** Before challenging the consecutive nature of the sentences, Appellant contests the imposition of maximum felony sentences. He concludes the sentences are contrary to law because the record does not support them, quoting *Marcum* where the Supreme Court observed: "an appellate court may vacate or modify a felony sentence on appeal only if it determines by clear and convincing evidence that the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law." *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 1, citing R.C. 2953.08(G)(2). Relying on this principle, Appellant claims the trial court failed to properly consider and weigh the purposes and principles of sentencing in R.C. 2929.11 and the seriousness and recidivism factors in R.C. 2929.12.

---

[3] Of the listed statutory divisions, Appellant cites to R.C 2929.14(C)(4) (consecutive sentencing). We note specific findings are no longer required under R.C. 2929.13(B)(1). *State v. Faiola*, 7th Dist. Mahoning No. 21 MA 0094, 2022-Ohio-1126, ¶ 13. Also, the community control presumption did not apply to the felonies of the fourth or fifth degree because they were not the most serious charges at the time of sentencing, and gross sexual imposition was excluded as R.C. 2901.01(A)(9)(a) defines it as an offense of violence. R.C. 2929.13(B)(1)(a)(ii). *See also* R.C. 2929.13(B)(1)(b) (offense of violence), (iii) (bond violation), (iv) (felony of the fourth or fifth degree sex offense in violation of section 2907).

**{¶99}** Although division (G)(2)(a) of R.C. 2953.08 only lists specific statutes (such as the consecutive sentencing statute), the *Marcum* Court additionally said "it is fully consistent for appellate courts to review those sentences that are imposed solely after consideration of the factors in R.C. 2929.11 and 2929.12 under a standard that is equally deferential to the sentencing court." *Id.* at ¶ 23. However, this statement has since been declared dicta and rejected. *State v. Jones*, 163 Ohio St.3d 242, 2020-Ohio-6729, 169 N.E.3d 649, ¶ 28.

**{¶100}** As the state points out, the Supreme Court in *Jones* decided a reviewing court cannot use subdivision (G)(2)(a) of R.C. 2953.08 to review whether the record supports R.C. 2929.11 or R.C. 2929.12 findings as those statutes are not listed in (G)(2)(a). *Id.* at ¶ 27-29. Furthermore, the "otherwise contrary to law" language in the sentencing review statute does not allow the appellate court to reverse by finding "the record does not support the sentence." *Id.* at ¶ 38.

**{¶101}** "Nothing in R.C. 2953.08(G)(2) permits an appellate court to independently weigh the evidence in the record and substitute its judgment for that of the trial court concerning the sentence that best reflects compliance with R.C. 2929.11 and 2929.12." *Id.* at ¶ 42 ("In particular, R.C. 2953.08(G)(2) does not permit an appellate court to conduct a freestanding inquiry like the independent sentence evaluation" the Court conducts when reviewing a death sentence). *See also State v. Toles*, 166 Ohio St.3d 397, 2021-Ohio-3531, 186 N.E.3d 784 (affirming based on *Jones* where a defendant argued the record did not support certain findings).

**{¶102}** In addition, as to Appellant's claim the trial court failed to consider certain general sentencing factors, we point out "neither R.C. 2929.11 nor 2929.12 requires a trial court to make any specific factual findings on the record." *Jones*, 163 Ohio St.3d 242 at ¶ 20, citing *State v. Wilson*, 129 Ohio St.3d 214, 2011-Ohio-2669, 951 N.E.2d 381, ¶ 31 and *State v. Arnett*, 88 Ohio St.3d 208, 215, 724 N.E.2d 793 (2000). We also note at the sentencing hearing and in the judgment entry, the trial court declared it reviewed the purposes and principles of sentencing in R.C. 2929.11 and the seriousness and recidivism factors in R.C. 2929.12. (Sent.Tr. 19); (12/2/20 J.E.).

**{¶103}** Regardless, Appellant's maximum sentence complaints are not convincing. For instance, he claims his conduct was less serious than that normally

constituting rape and gross sexual imposition. However, the trial court could easily reject such a contention as to victim B. The statutory seriousness factors discuss the age of the victim, physical or mental injury, the relationship facilitating the offenses, mitigating grounds or victim-inducement (and the lack thereof), and any other factor believed to be relevant. R.C. 2929.12(B)-(C). Furthermore, recidivism was highly likely considering the circumstances of this case and Appellant's repeated grooming of juveniles (including this 14-year-old), such as by providing them with alcohol and tobacco and by allowing them to sleep at his house (even though his children were not present) where they smoked marijuana and drank alcohol. Appellant could be seen as failing to live a law-abiding life and failing to exhibit genuine remorse for circumstances he continually created. *See* R.C. 2929.12 (D)(5),(E)(4) (recidivism factors plus any other relevant factor).

**{¶104}** These high recidivism concerns would likewise apply to the sentence for the rape of victim A. In addition, Appellant's contention that the allegations by victim A are not very serious due to the initial consent need not be accepted by a sentencing court. Appellant continued to perform painful anal sex on the 17-year-old for five to ten minutes after being asked to stop multiple times while his arms were restrained and his body was in an unfamiliar and submissive position. Victim A explained the incident seriously affected his life. In any event, the aforementioned Supreme Court warned the appellate judges shall not independently weigh the evidence in the record and substitute their judgment for that of the trial court as to whether the sentence was appropriate under R.C. 2929.11 and 2929.12. *Jones*, 163 Ohio St.3d 242 at ¶ 38, 42.

**{¶105}** We turn to Appellant's challenge of the trial court's imposition of consecutive sentences. "In order to impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, but it has no obligation to state reasons to support its findings." *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 37. Appellant agrees the court made the consecutive sentence findings at the sentencing hearing and in the judgment entry as required. The court utilized (C)(4)(b), which entails a finding:

> that the consecutive service is necessary to protect the public from future
> crime or to punish the offender and that consecutive sentences are not

disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and * * * (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

R.C. 2929.14(C)(4)(b).

{¶106} Appellant argues the record does not support the findings, and this argument is reviewable under R.C. 2953.08(G)(2)(a). Specifically, Appellant contests whether consecutive sentences were proportionate to the seriousness of his conduct and the danger he poses and whether the harm was sufficiently great or unusual.

{¶107} Notably, "the clear and convincing standard used by R.C. 2953.08(G)(2) is written in the negative. It does not say that the trial judge must have clear and convincing evidence to support its findings. Instead, it is the court of appeals that must clearly and convincingly find that the record does not support the court's findings." *State v. Perez*, 7th Dist. Mahoning No. 21 MA 0058, 2022-Ohio-1124, ¶ 28, quoting *State v. Venes*, 2013-Ohio-1891, 992 N.E.2d 453, ¶ 21 (8th Dist.). "In other words, the restriction is on the appellate court, not the trial judge. This is an extremely deferential standard of review." *Id.*

{¶108} We refer to our above discussion on seriousness and recidivism. Appellant's likelihood of recidivism relates to the danger he poses to the public, and the conduct was serious. The court saw the rape victims testify. Victim A, who was only 17 years old during the offense, explained his drinking substantially increased after Appellant held him down and refused to stop performing painful anal sex on him after he repeatedly asked Appellant to stop. Victim B was only 14 years old when Appellant woke him by holding him down and covering his mouth. Appellant then fondled him, performed oral sex on him, and anally raped him while continuing to hold him down. Additionally, the child-victims with their genitals graphically on display in the lewd photographs are continuously exploited and harmed for years by people who collect such images. (We

Case No. 20 MA 0131

also note Appellant was only sentenced to two six-month terms, even though there were more than two children in the photographs.)

**{¶109}** Contrary to Appellant's contention, consecutive service is not disproportionate to the seriousness and the danger he poses, and the record supports a finding of harm so great or unusual that one prison term would not have adequately reflected the seriousness of the conduct. This court concludes: We cannot clearly and convincingly find the record fails to support the consecutive findings. This assignment of error is overruled.

<u>ASSIGNMENT OF ERROR FIVE: EFFECTIVENESS OF COUNSEL</u>

**{¶110}** Appellant's fifth and final assignment of error provides:

"APPELLANT'S COUNSEL WAS INEFFECTIVE."

**{¶111}** A claim of ineffective assistance of counsel requires a showing of both deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). If the performance was not deficient, then there is no need to review for prejudice and vice versa. *See State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000).

**{¶112}** In evaluating an alleged deficiency in performance, the court asks whether there was "a substantial violation of any of defense counsel's essential duties to his client." *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989). Our review is highly deferential to counsel's decisions as there is a strong presumption counsel's conduct was within the wide range of reasonable professional assistance. *Id.* at 142-143, (there are "countless ways to provide effective assistance in any given case"), citing *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. A reviewing court should not second-guess the strategic decisions of counsel. *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995).

**{¶113}** On the prejudice prong, a lawyer's errors must be so serious that there is a reasonable probability the result of the proceedings would have been different. *Carter*, 72 Ohio St.3d at 558. Lesser tests of prejudice have been rejected: "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Bradley*, 42 Ohio St.3d at 142, fn. 1, quoting *Strickland*, 466 U.S. at 693. Prejudice from defective representation justifies reversal only where the results were unreliable or the proceeding was fundamentally unfair due to the performance of trial

counsel. *Carter*, 72 Ohio St.3d at 558, citing *Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

{¶114} Appellant contends his trial counsel failed to thoroughly cross-examine victim B, whose testimony resulted in a rape and a gross sexual imposition conviction. This was the 14-year-old child who testified Appellant held him down, touched his penis, performed oral sex on him, and then subjected him to anal sex while continuing to hold him down. Appellant testified he masturbated the child with consent on April 16, 2016 and three subsequent times. In arguing victim B's story lacked credibility under the weight of the evidence assignment of error, Appellant pointed out victim B continued to communicate with him in the year after the incident.

{¶115} Under this assignment of error, Appellant complains his attorney did not impeach victim B while he was on the stand by asking about his subsequent communications with Appellant. Specifically, Appellant points out victim B asked him for a ride a year after the incident (not long before Appellant was arrested), citing "Attachment D." Appellant argues there was no strategic reason for refraining from impeaching victim B with this evidence while he was on the stand. He claims this resulted in prejudice because this child's credibility was key to the rape in count two and the gross sexual imposition in count three.

{¶116} The state argues the cited evidence is not in the record and thus cannot be raised on direct appeal. *See State v. Hartman*, 93 Ohio St.3d 274, 299, 754 N.E.2d 1150 (2001) (if a claim of ineffective assistance of counsel requires proof from outside of the record, then such claim is not appropriately considered on direct appeal); *State v. Ishmail*, 54 Ohio St.2d 402, 406, 377 N.E.2d 500 (1978) (the appellate court is limited to what transpired as reflected by the record on direct appeal). However, the appellate record is not confined to the evidence introduced at trial; rather, the appellate court can view other parts of the trial court's record, including pre-trial filings and hearings.

{¶117} The suppression proceedings evaluated the probable cause for the warrant. The affidavits used to support the search warrants for Appellant's residences and devices are part of the record of this case. They were attached to the suppression motion and admitted as exhibits at the suppression hearing. (Supp.Tr. 80-82, 123; St.Ex. 4, 7). The affiant said the earlier Instagram warrant revealed communications between

Appellant and victim B from April 2017, wherein the juvenile asked Appellant for products and for a ride. (5/11/20 Aff. at ¶ 28) (using initials matching the first and last initial of the juvenile in count two and three of the indictment). Therefore, even if "Attachment D" cited by Appellant here was not part of the trial record, the information relied upon by Appellant was essentially in the record in another form, the affidavit in support of the search warrant at ¶ 28, which was cited by Appellant in the third assignment of error. Moreover, as explained further below, there was testimony on the subject.

{¶118} Defense counsel asked victim B about his contact with Appellant after the April 16, 2016 incident, initially inquiring whether victim B returned to Appellant's house after that night. Victim B answered in the negative and then started having a meltdown. (Tr. 507). As can be seen throughout the testimony, victim B had a difficult and emotional time testifying. (Tr. 450, 452, 455, 457-461). As mentioned again at sentencing, the victim's pain was apparently evident. (Sent.Tr. 15). Appellant's own testimony about victim B's testimony noted: "I heard him crying. I heard the agony. I actually felt his pain, but it didn't happen. * * * he was clearly upset." (Tr. 703). By the end of cross-examination, victim B seemed to reach a breaking point, becoming angry and threatening toward Appellant and defense counsel. It was understandable that defense counsel backed off from pressing the victim on the topic. In fact, the state did not even conduct redirect examination due to the victim's deteriorating condition on the stand.

{¶119} Although Appellant complains counsel failed to adequately cover the subject of their continued communication while victim B was testifying, counsel did elicit this evidence from other witnesses. Defense counsel asked the investigating officer if *victim B was one of the juveniles Appellant provided with cigars in 2017*, and *the officer answered in the affirmative and said there were messages showing victim B communicated with Appellant* at that time and for that purpose. (Tr. 599). Moreover, Appellant testified victim B returned to his house soon after the incident (stating he masturbated victim B again and on subsequent occasions). (Tr. 643-644). Appellant also mentioned receiving friendly social media messages from victim B thereafter. (Tr. 700).

{¶120} Considering the totality of the circumstances, counsel's performance was not deficient. It was a strategic decision to avoid further questioning of victim B, who was viewed as having the jury's sympathy and who was starting to get angry. "The scope of

cross-examination clearly falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel." *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 45.

**{¶121}** Moreover, reversible prejudice is lacking. The jury heard that victim B participated in communicating with Appellant after the incident, even as recent as the month prior to his May 2017 disclosure (which was a year after the incident). This did not dissuade the jurors from assessing victim B as credible. Contrary to Appellant's suggestions, it was not incredible that a rape victim would continue to associate with his assailant when the victim is a 14-year-old child who was groomed and being supplied with illegal products, especially when his friends also participated in communicating with Appellant. There is no indication the results were unreliable or the proceeding was "fundamentally unfair" due to the performance of trial counsel on this issue. See *Carter*, 72 Ohio St.3d at 558. This assignment of error is overruled.

**{¶122}** For the foregoing reasons, Appellant's assignments of error are overruled, his convictions are upheld, and the trial court's judgment is affirmed.

Donofrio, P J.,concurs.

Waite, J., concurs.

———————————————————

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and Appellant's convictions are upheld.  It is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed.  Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.


## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**