[Cite as *State v. Freeman*, 2021-Ohio-734.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**GREENE COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2020-CA-33 |
| v. | : | Trial Court Case No. 2019-CR-521 |
| ANTHONY L. FREEMAN | : | (Criminal Appeal from Common Pleas Court) |
| Defendant-Appellant | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 12th day of March, 2021.

. . . . . . . . . . .

MARCY A. VONDERWELL, Atty. Reg. No. 0078311, Assistant Prosecuting Attorney, Greene County Prosecutor's Office, Appellate Division, Greene County Courts Building, 61 Greene Street, Suite 200, Xenia, Ohio 45385
Attorney for Plaintiff-Appellee

NICOLE RUTTER-HIRTH, Atty. Reg. No. 0081004, 2541 Shiloh Springs Road, Dayton, Ohio 45426
Attorney for Defendant-Appellant

. . . . . . . . . . . . .

EPLEY, J.

**{¶ 1}** Defendant-Appellant Anthony L. Freeman was found guilty by a Greene County jury of rape, in violation of R.C. 2907.02(A)(2), and sentenced to three years in prison. Freeman alleges that the trial court erred in denying his motions for a mistrial and then a new trial, that the guilty verdict was not supported by sufficient evidence and was against the manifest weight of the evidence, and that the court erred by admitting certain evidence. Finally, he avers that the accumulation of all the errors deprived him of a fair trial. For the following reasons, the trial court's judgment will be affirmed.

## I. Facts and Procedural History

**{¶ 2}** On February 20, 2019, C.B., a then-18-year-old freshman at Central State University, was in the math building on campus when she met Freeman, another Central State student. The two started talking, decided to exchange numbers, and then C.B. went to class.

**{¶ 3}** Later that day, C.B. and Freeman exchanged texts and Freeman suggested that she come over to his apartment later to watch a movie. C.B. was apprehensive about meeting up at his residence because they had just met, but after more texts back and forth, the plan was made for C.B. to come over. It also was decided that C.B. would spend the night, however she made it clear that they would not be "sleeping with each other." Trial Tr. at 691.

**{¶ 4}** That evening, Freeman picked C.B. up at her dorm and drove back to the apartment he shared with several other people. They entered through a back door, and while C.B. did not see any other people there at the time, she heard what she believed to be someone in another room playing video games. After a brief chat about having a

roommate who attended Wright State University, Freeman escorted C.B. to his room and closed the door behind them. C.B. testified at trial that all the lights were out in the room and the temperature was quite warm. The temperature in the room led C.B. to shed her jacket and sweatpants, leaving her wearing a pair of running shorts (with a built-in liner) and a t-shirt. Evidence was presented at trial that she was not wearing a bra or panties.

**{¶ 5}** C.B. and Freeman started watching a movie on his computer. She was sitting on the bed and Freeman was positioned laying down behind her. The two chatted throughout the first part of the movie. C.B. testified that they talked about where they were from, their birthdays and astrological signs, and that she had recently done her own hair, leading to a sore back. Freeman offered a massage, but C.B. rejected the overture.

**{¶ 6}** After watching the movie a little longer, Freeman, still behind C.B., removed her shirt, leaving her unclothed from the waist up because she was not wearing a bra. C.B. was surprised by the action and promptly laid down on her stomach so that she would not be exposed. With C.B. laying down on her stomach, Freeman straddled her back and began to massage her. Next, he tried to take off her shorts, but this action was met with resistance from C.B., who told him to get off. Freeman complied, which allowed C.B. to get off the bed. She retrieved her shirt and positioned herself facing the wall so that she could get dressed with some degree of privacy.

**{¶ 7}** Freeman then got off the bed and walked toward C.B. He managed to relocate her so that she fell backward onto the bed, and he forcefully removed her clothes. For the next 10-15 minutes, Freeman engaged in vaginal intercourse with C.B. She testified that, throughout the encounter, she attempted to push him away and told him to stop, but to no avail. When the ordeal was over, Freeman went to the bathroom and C.B.

got dressed. When he came back, C.B. told Freeman to take her home. Once back on campus, Freeman said, "I'm sorry that tonight was rough for you, but I had a good time."

**{¶ 8}** When she arrived back in her dorm room, C.B. made several phone calls. The first person she talked to was her friend named Jazzy. She and another friend, TJ, quickly got to her room. C.B. also contacted her mother, who rushed over from out of town. Campus police and Greene County deputies were then notified, and the decision was made to drive to Greene Memorial Hospital for a sexual assault examination.

**{¶ 9}** Based on the identification and information received from C.B., Greene County deputies, led by Detective Jonathan Emery, were able to obtain search warrants for Freeman's apartment and DNA. The information gained from the execution of those warrants ultimately led to Freeman's arrest and indictment on rape (R.C. 2907.02(A)(2)) and gross sexual imposition (GSI) (R.C. 2907.05) charges.

**{¶ 10}** After several COVID-19 related delays, the case proceeded to trial on July 7, 2020. Almost immediately defense counsel alleged irregularities. Before any witnesses were called, defense counsel moved for a mistrial due to alleged misconduct between a potential juror and a State's witness. The motion was denied, and a jury was selected. The State presented nine witnesses, including law enforcement, two forensic scientists, a sexual assault nurse examiner (SANE), a social worker, a friend of C.B., and C.B. herself.

**{¶ 11}** Defense counsel made several motions during trial. At the close of the State's case-in-chief, Freeman's trial counsel made a partially successful Crim.R. 29 motion. The GSI count was dismissed, but the rape charge remained. He also unsuccessfully objected to the admission of several pieces of evidence, including the

SANE kit and its contents. Freeman did not testify.

**{¶ 12}** After deliberating, the jury found Freeman guilty of rape and a disposition date was set. In the meantime, defense counsel filed a motion for a new trial, alleging irregularity in creating the jury pool. Both sides briefed and argued the matter, but the court ultimately denied Freeman's motion. The court then sentenced him to three years in prison and classified him as a Tier III sex offender. Freeman now raises five assignments of error.

**II. Jury pool selection**

**{¶ 13}** In his first assignment of error, Freeman contends that he should have been granted a new trial because the procedures used to create the jury pool, which excused some people 65 years and older, violated his Sixth Amendment rights. We disagree.

**{¶ 14}** R.C. 2313.16 and Crim.R. 24 control the selection of juries. Crim.R. 24(F) states that either side "may challenge the array of petit jurors on the ground that it was not selected, drawn or summoned in accordance with the law. A challenge shall be made before the examination of the jurors pursuant to division (B) of this rule and shall be tried by the court." Crim.R. 24(F). Neither an array of petit jurors nor a jury's verdict can be set aside because the jury commissioner has returned such a jury or juror in any informal or irregular manner, "if in the opinion of the court the irregularity is unimportant and insufficient to vitiate the return." *Id*.

**{¶ 15}** There is no question that Freeman's challenge to the jury array was made *after* the examination of the jurors. In fact, it was not raised until after the trial had been completed. Because the challenge was untimely, Freeman has waived the issue. *See*

*Sate v. Curry*, 2d Dist. Greene No. 2012-CA-50, 2014-Ohio-3836, ¶ 30. Nevertheless, even if the argument were not waived, the argument fails on the merits.

**{¶ 16}** Selecting a jury from a representative cross-section of the community is an important element of the Sixth Amendment right to jury trial. *Taylor v. Louisiana*, 419 U.S. 522, 528, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). The Sixth Amendment does not, however, require that juries "mirror the community and reflect the various distinctive groups in the population." *Id*. at 538. It does demand, though, that the "jury wheels, pools of names, panels or venires from which the juries are drawn must not systematically exclude distinctive groups in the community." *Id*.

**{¶ 17}** The United States Supreme Court in *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), held that to establish a prima facie violation of the cross-section requirement, a defendant must demonstrate that (1) the group purported to be excluded is a "distinctive" group in the community; (2) the representation of the group in venires from which juries are picked is not fair and reasonable in relation to the number of those persons in the community; and (3) the underrepresentation is because of the systematic exclusion of the group in the selection process. *Id*. at 364. If there is a prima facie showing, the State bears the burden of "justifying this infringement by showing attainment of a fair cross section to be incompatible with a significant state interest." *Id*. at 368.

**{¶ 18}** Freeman cannot meet even the first *Duren* prong. Freeman seems to argue that the 65 years and older age bracket is a "distinctive" group in the community. He does not, however, provide any information to demonstrate its distinctiveness. For instance, in *Duren*, the appellant established that 54% of the adults in the county were women but

that only about half that number were summoned for jury duty in the months immediately preceding his trial. *Id*. at 357. He further demonstrated that his male-only jury was chosen from a panel of 53, of whom only five were females. *Id*. Freeman, on the other hand, simply states that jurors over 65 who expressed COVID concerns were systematically excluded.

**{¶ 19}** The Ohio Supreme Court has given further guidance. “In determining whether a group excluded from jury service is a distinctive one, courts have looked to community prejudices toward the group.” *State v. Puente*, 69 Ohio St.2d 136, 139, 431 N.E.2d 987 (1982). *See also Herdandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954). There is nothing in the record that demonstrates older Greene County residents who have COVID-19 concerns are distinctive or that there is prejudice toward them. *See also Ellis v. State*, 867 P.2d 1289, 1294 (Ok.App.1992) (persons over 70 years of age are not a distinctive group).

**{¶ 20}** Finally, it cannot be said that the trial court abused its discretion. The decision to grant a new trial is within the sound discretion of the trial court, and this Court will not disturb the decision absent an abuse of discretion. *State v. Hartman*, 2016-Ohio-2883, 64 N.E.3d 519, ¶ 35 (2d Dist.). “An abuse of discretion implies an arbitrary, unreasonable, or unconscionable attitude on the part of the court.” *Id*. This decision was none of those.

**{¶ 21}** On March 9, 2020, Governor Mike DeWine declared a state of emergency (Executive Order 2020-01D) in response to the COVID-19 pandemic. A few weeks later, on March 20, 2020, the Ohio Supreme issued a document entitled: Guidance to Local Courts COVID-19 Public Health Emergency. The Supreme Court followed up with a

series of guidance bulletins that left "[to] the sound discretion of the local judiciary how best to manage the daily challenges that the COVID-19 pandemic ha[d] foisted on local courts." *State ex rel. McArtor v. Kovack*, 158 Ohio St.3d 1472, 2020-Ohio-1489, 143 N.E.3d 508, ¶ 14 (Kennedy, J., dissenting).

**{¶ 22}** The Chief Justice, along with the Ohio Jury Trial Advisory Group, also released a report that gave recommendations on how to best resume jury trials amid the pandemic. The report recommended that jurors share health concerns before trial, that remote juror questionnaires be used, that COVID concerns should allow for deferment as a medical condition, and that older and high risk jurors should be excused. *Standards and Practices Essential to the Resumption of Jury Trials in Ohio* at 10-12.

**{¶ 23}** In this case, the steps the trial court took to ensure the health and safety of all parties involved were reasonable. According to the testimony of the jury commissioner and the statements made by the court, all potential jurors were called to discuss COVID-19 precautions and to ensure there were no concerns. Jurors aged 65 and older with concerns about the disease were excused. However, if they did not have safety concerns, they reported for duty as scheduled. Jurors under 65 with concerns were dismissed with a doctor's note. The court reasoned that this procedure was adopted for two reasons – the health and safety of all parties involved, and so that there were no distracted jurors worrying about their health and not the testimony being presented to them.

**{¶ 24}** We take no position on the propriety of these steps in normal times, but in the midst of a pandemic, the actions were reasonable, and the trial court did not abuse its discretion. The first assignment of error is overruled.

**III. Allegations of Jury Misconduct**

**{¶ 25}** Freeman next argues that he was entitled to a mistrial based on alleged misconduct by a prospective juror and a witness for the State. "Mistrials need to be declared only when the ends of justice so require, and a fair trial is no longer possible." *State v. Patterson*, 188 Ohio App.3d 292, 2010-Ohio-2012, 935 N.E.2d 439, ¶ 69 (2d Dist.). The decision is within the trial court's discretion, and to overturn it, an appellant must demonstrate the decision was arbitrary, unreasonable, or unconscionable. *Id*.

**{¶ 26}** According to the record, at some point during the lunch break – between when the jury was selected and when testimony began – the attorneys from both sides observed a State's witness sitting on a bench outside of the courtroom talking to another man. Because the man was wearing a mask, neither attorney recognized him, but both felt the need to investigate further.

**{¶ 27}** The lead detective in the case, Jonathan Emery, who was also in the hallway at that time, went to inquire. He was informed that the individual talking with the witness was a juror. Detective Emery told the man that he could not be sitting next to the witness, so the juror got up and went into the jury room.

**{¶ 28}** Detective Emery walked into the jury room (where several empaneled jurors were waiting) to further inquire about the situation. The detective returned to the hallway with the man a short time later and reported to the attorneys that the man was Juror Number 12, someone who had already been excused.

**{¶ 29}** After Juror Number 12 left the building, the court was informed, and the jury was brought back into the courtroom. Once seated inside, the court asked who had been in the jury room when Juror Number 12 and Detective Emery came in. Three jurors raised

their hands and were questioned individually. All three testified that Juror Number 12 said nothing about the case, and that the incident would not keep them from being fair and impartial. Further, all three testified that they did not hear Detective Emery say anything when he was in the room. After the testimony of the jurors, defense counsel asked for a mistrial. The court denied the motion but did give a curative instruction to the jury about the incident.

**{¶ 30}** Freeman argues that the conversations - between the excused juror and the State's witness in the hallway; between the excused juror and the empaneled jurors in the jury room; and between Detective Emery and the excused juror – all were prejudicial. The record, however, belies that argument.

**{¶ 31}** First, whatever was said between the State's witness and Juror Number 12 was not a conversation with an actual, empaneled juror. It is undisputed that Juror Number 12 had already been dismissed by that time. With regard to conversations that took place in the jury room, one of the jurors present testified that Juror 12 said "nothing to do with why we're here." Trial Tr. at 164. Another juror present testified that:

> He was talking about – he was, he said he was outside sitting on a bench and a sheriff or someone from – a deputy came and sat near him; and even though they weren't talking about the case at all, it sounded like he was going to have to be removed. That's the extent of the conversation.

Trial Tr. at 166-167. Finally, a third juror told the court, "I heard nothing about the case. I heard the gentleman outside saying, he had been called and canceled. Then he came in and sat down. * * * I heard nothing about the case." Trial Tr. at 167-168.

**{¶ 32}** None of the jurors heard Detective Emery say anything.

**{¶ 33}** The interactions between Juror Number 12, the witnesses, and the three empaneled jurors, while arguably improper, were not prejudicial to Freeman. The conversations could not have been about the case (testimony had not yet begun), and while there should not be co-mingling between witnesses and jurors, Freeman has failed to demonstrate that a fair trial was no longer possible. The trial court's decision to deny the mistrial motion was not an abuse of discretion. The second assignment of error is overruled.

## IV. Sufficiency and Weight of the Evidence

**{¶ 34}** In his third assignment of error, Freeman argues that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence.

**{¶ 35}** "[S]ufficiency is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). It is essentially a test of adequacy. "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Id.*

**{¶ 36}** "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Marshall*, 191 Ohio App.3d 444, 2010-Ohio-5160, 946 N.E.2d 762, ¶ 52 (2d Dist.). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

*Id.*

**{¶ 37}** "A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19. When reviewing an argument challenging the weight of the evidence, an appellate court may not substitute its view for that of the trier of fact. Rather, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact "clearly lost its way and created such a manifest miscarriage of justice" that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶ 38}** Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

**{¶ 39}** Although sufficiency and manifest weight are separate legal concepts, manifest weight can subsume sufficiency in conducting the analysis – finding that a conviction is supported by the manifest weight of the evidence necessarily comprises a

finding of sufficiency. *State v. Sizemore*, 2d Dist. Montgomery No. 28151, 2019-Ohio-4186, ¶ 16. As a result, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15.

A. Sufficiency

**{¶ 40}** Both sides agree that Freeman and C.B. engaged in sexual conduct on the late night or early morning hours of February 20-21, 2019. Freeman asserts that the conduct was consensual.

**{¶ 41}** Freeman was charged with rape, a violation of R.C. 2907.02(A)(2). According to the statute, "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." R.C. 2907.02(A)(2). A victim does not need to prove physical resistance. R.C. 2907.02(C). Accordingly, the crime is completed "only if the perpetrator purposely compels the other to submit by force or threat of force." *State v. Wilkins*, 64 Ohio St.2d 382, 385, 415 N.E.2d 313 (1980).

**{¶ 42}** We have previously held in rape cases that to prove the defendant acted purposely, "the State must prove that it was the defendant's intention to engage in sexual conduct by forcefully compelling the other person to submit to the sexual conduct." *State v. Hartman*, 2016-Ohio-2883, 64 N.E.3d 519, ¶ 26 (2d Dist.); *In re S.W.E.*, 2d Dist. Greene No. 2020-CA-27, 2021-Ohio-80, ¶ 31. Evidence of consent (or lack thereof) is important to the inquiry. It is not a static concept, though. Rape can be established when the two participants start the encounter on a consensual basis, "but the consent is revoked by

words, actions or conduct that clearly communicates non-consent, the defendant fails to respect the change in consent, and purposely proceeds to engage in sexual conduct through force or threat of force evidenced by violence, physical restraint, or some type of coercive or threatening conduct that creates a belief or fear that physical force will be used if the victim does not consent." *Id*. at 32.

**{¶ 43}** Here, the State's evidence established that C.B. did not consent to the sexual encounter and that she made that fact clear from the early stages of their communication, texting that they would not be "sleeping with each other." She testified that her text meant they would not be having sex. Once at Freeman's apartment, when he straddled C.B. and attempted to remove her shorts, she told him to get off. When he pushed her back onto the bed and removed her clothes, C.B. testified that she told Freeman to stop. When he vaginally penetrated her, C.B. told him to stop and tried to push him away.

**{¶ 44}** Throughout her time on the stand, C.B. maintained that Freeman did not have consent to do any of the things he did to her, as illustrated in the following exchange with the prosecutor:

> Prosecutor: [In the] late night hours of February 20th, early morning hours of February 21st of 2019, did you want to engage in sex with Defendant?
>
> C.B.: No.
>
> Prosecutor: What did you tell him to indicate you did not want to have sex with him?
>
> C.B.: I told him I didn't want to have sex with him. I told him no. I told him to stop.

Prosecutor: Once?

C.B.: Multiple times.

Trial Tr. at 758.

**{¶ 45}** Freeman, though, argues that he *had* consent; he points to the facts that C.B. was not wearing a bra or panties and that she packed an overnight bag to buttress his assertion. Even if there were not innocent explanations – C.B. testified that she packed the bag because she had class early in the morning, and the shorts were running shorts that had a built-in liner that acted as underwear – Freeman did not stop his advances when C.B. asked him to, then told him to, then pleaded with him to. Neither did he stop when she tried to push him off.

**{¶ 46}** He also contends that the physical evidence did not point to force being applied, rather it demonstrated a consensual encounter. While Freeman is correct that there did not appear to be vaginal injuries, this topic was addressed by Samantha Griffith, the SANE nurse who examined C.B. shortly after the incident. She testified that a lack of visible, physical injuries, did not mean there was no assault. "Most of the time we do not see vaginal injuries. * * * Younger women have a higher estrogen level. * * * The skin is more elastic, and there is a lot more lubrication in that area, so most of the time you won't see * * * vaginal injuries on younger women." Trial Tr. at 322.

**{¶ 47}** Freeman also argues that C.B.'s actions after the incident – chatting with Freeman on the car ride home, not alerting a nearby security guard, texting Freeman once she returned to her room – were signs of a consensual encounter. This contention was addressed at trial as well. Debbie Matheson, the executive director of the Family Violence Prevention Center, testified that there is a range of ways that someone might

behave after sexual violence. “A victim’s experience is their own * * * and when they feel safe and ready, they will communicate with someone that they believe they are safe to communicate with, so that may not be the first person they see. It may not be the first person that is, you know, near them.” Trial Tr. at 621.

**{¶ 48}** The jury had before it ample evidence that C.B. did not consent to sex of any kind, and that Freeman purposely compelled her to submit by force. The verdict was supported by sufficient evidence.

B. Manifest Weight

**{¶ 49}** We turn now to the manifest weight of the evidence. Because there were no issues in this case regarding identity – Freeman fully admits he was there and had sex with C.B. – the dispositive issue for the jury was simply if C.B. was credible. They apparently found her testimony credible and convicted Freeman of rape.

**{¶ 50}** A case should not be reversed as being against the manifest weight of the evidence except “in the exceptional case in which the evidence weighs heavily against the conviction.” *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541. This Court has said that it will not substitute its judgment for that of the trier of fact on the issue of witness credibility “unless it is patently apparent that the trier of fact lost its way in arriving at its verdict.” *State v. Smith*, 2d Dist. Montgomery No. 25462, 2013-Ohio-5345, ¶ 16.

**{¶ 51}** We cannot say that the jury lost its way. C.B. maintained throughout her testimony that she did not consent to sex with Freeman. Her story remained substantially the same from the time she first met with Detective Emery shortly after the incident, all the way through cross examination at trial. The jury believed her and we will not second guess that determination.

**{¶ 52}** The verdict was neither based in insufficient evidence nor against the manifest weight of the evidence. The third assignment of error is overruled.

## V. Admission of exhibits

**{¶ 53}** Freeman's fourth argument is that the trial court committed reversible error when it admitted the SANE kit and its contents into evidence.

**{¶ 54}** "The admission or exclusion of evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173, 180, 510 N.E.2d 343 (1987). Disagreements about the admission of evidence are decided under an abuse of discretion standard. *Id*. at paragraph two of the syllabus. "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34. This is a deferential review and "does not permit an appellate court to simply substitute its judgment for that of the trial court." *Id*.

**{¶ 55}** When it comes to physical evidence, authentication or identification is a condition precedent to admissibility. Evid.R. 901(A). This condition can be satisfied with a showing that the matter in question is what its proponent claims. *Id*.

**{¶ 56}** At the close of the State's case-in-chief, defense counsel objected to the admission of the SANE kit and its contents (Exhibits 9, 11, 12, 13, 14), arguing that the witness who completed the examination on C.B. had insufficient recollection to properly authenticate it. While it is true that the witness had little memory about the details of this specific exam, she was able to explain the process she always goes through when collecting the evidence and giving the exams, recognized her signature (signifying she

did indeed do the exam), and remembered sealing the contents after its completion. In other words, she testified that she knew she collected the SANE kit based on the signature and notes. Based on this record, we cannot say the trial court abused its discretion in admitting Exhibits 9, 11, 12, 13, and 14.

**{¶ 57}** Freeman also argues that it was error for the court to admit the Ohio Bureau of Criminal Investigation report, Exhibits 19A and B. These documents, though, were only used to refresh the recollection of the witness, and the State did not move to admit them into the evidence.

**{¶ 58}** Finally, assuming, even for the sake of argument, it was error for the exhibits to be admitted into evidence, it was harmless error. The SANE kit contained DNA used to identify Freeman, but his identity was not an issue in this case. Freeman fully admitted to engaging in sexual conduct with C.B.; he just contended it was consensual. Exhibits 9, 11, 12, 13, and 14 were superfluous, and their admission was not prejudicial.

**{¶ 59}** The admission of the contested exhibits was not an abuse of discretion. The fourth assignment of error is overruled.

## VI. Cumulative Error

**{¶ 60}** Finally, Freeman argues that the cumulative effect of all the purported errors deprived him of a fair trial. The cumulative error doctrine states that a conviction will be reversed where "the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). This doctrine, however, only applies where there are

"multiple instances of harmless error." *Id*.

**{¶ 61}** To find cumulative we must find: (1) that multiple errors were committed at trial, and (2) there is a reasonable probability that but for the multiple errors, the outcome of the trial would have been different. *State v. Goldblum*, 2d Dist. Montgomery No. 25851, 2014-Ohio-5068, ¶ 58.

**{¶ 62}** After exploring the record, Freeman has not demonstrated that multiple errors occurred. That necessarily eliminates the possibility of reversal due to cumulative error. The fifth assignment of error is overruled.

## VII. Conclusion

**{¶ 63}** The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

TUCKER, P. J. and HALL, J., concur.

Copies sent to:

Marcy A. Vonderwell
Nicole Rutter-Hirth
Successor of Judge Stephen Wolaver