[Cite as *State v. Mayes*, 2024-Ohio-1801.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
DARKE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2023-CA-18 |
| | : | |
| v. | : | Trial Court Case No. 23-CR-00027 |
| | : | |
| MARC MAYES | : | (Criminal Appeal from Common Pleas Court) |
| | : | |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on May 10, 2024

. . . . . . . . . . .

ADAM JAMES STOUT, Attorney for Appellant

R. KELLY ORMSBY, III, Attorney for Appellee

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Appellant, Marc Mayes, appeals from his convictions for robbery and theft following a jury trial in the Darke County Court of Common Pleas.  In support of his appeal, Mayes contends that the trial court erred at sentencing by failing to merge his convictions as allied offenses of similar import.   Mayes also contends that his convictions were against the manifest weight of the evidence.   In addition, Mayes contends that he

was denied his right to a fair and impartial jury due to the trial court's summoning individuals from the courthouse on the day of trial to be part of the jury array without the parties' consent. For the reasons outlined below, we disagree with Mayes's claims and will affirm the judgment of the trial court.

**Facts and Course of Proceedings**

{¶ 2} On February 23, 2023, a Darke County grand jury returned an indictment charging Mayes with one second-degree-felony count of robbery in violation of R.C. 2911.02(A)(2) and one fifth-degree-felony count of theft in violation of R.C. 2913.02(A)(1). The charges stemmed from allegations that Mayes stole over $1,000 in merchandise from a home-goods retailer known as Rural King and threatened physical harm against a Rural King employee while fleeing the scene. After Mayes's indictment, the trial court held an arraignment hearing and entered a plea of not guilty on his behalf. The case then proceeded to a two-day jury trial. The following is a summary of the evidence that was presented at Mayes's trial.

{¶ 3} On February 7, 2023, Kirk Young was working as the support manager of a Rural King store located in the city of Greenville, Darke County, Ohio. Around noon that day, Young was using a forklift to move freight outside the store approximately 15 to 20 feet away from the store's emergency exit. While doing so, Young observed a man leave the store through the emergency exit while pushing a shopping cart full of merchandise. The emergency exit was not supposed to be used by customers and was not near the store's cash registers. Because of this, and because none of the merchandise in the

man's shopping cart was in bags, Young believed the man was shoplifting.

{¶ 4} After observing the shoplifter pass through the emergency exit with the merchandise, Young radioed his fellow employees to apprise them of the situation. Young also yelled for the shoplifter to "stop," but the shoplifter kept going. Young then used the forklift he was riding to follow the shoplifter. When Young was about two or three feet away from the shoplifter, Young saw the shoplifter reach into the front pocket of the hooded sweatshirt he was wearing and heard the shoplifter say he had a gun. Although Young never actually saw a gun, Young felt threatened and scared by the shoplifter's statement and backed away.

{¶ 5} A few moments later, Young continued to follow the shoplifter, who ran toward the employee parking lot. Young once again told the shoplifter to "stop," and the shoplifter once again reached into his sweatshirt pocket and told Young that he had a gun. Because Rural King has a policy that forbids employees from physically intervening with shoplifters, Young stopped about 50 feet away from the shoplifter and watched him load the stolen merchandise into a black Chevrolet Impala. Thereafter, Young saw the shoplifter quickly drive away with the stolen merchandise.

{¶ 6} While Young was watching the shoplifter, another Rural King employee called 9-1-1 for assistance. Officers from the Greenville Police Department responded to the 9-1-1 call and arrived at Rural King a few minutes after the shoplifter had fled the scene. When the officers arrived, Young and another Rural King manager showed the officers a video captured by the store's security cameras. On the video, Young was able to point out the shoplifter that he had encountered. One of the officers used his cell

phone camera to take pictures of the shoplifter as shown on the video. The pictures of the shoplifter were then sent to other officers in the area. To assist with the investigation, Rural King's corporate office later provided a copy of the security-camera video to the Greenville Police Department.

{¶ 7} Clips and still shot images from the Rural King security-camera video were admitted into evidence at Mayes's trial. *See* State's Ex. 1-12 and 14(A)-(C). The video clips showed the shoplifter pushing a shopping cart full of merchandise through the store's emergency exit at 12:11 p.m. Thereafter, the shoplifter could be seen evading an employee on a forklift by walking between large metal storage pods and by running from the employee when the employee got within a few feet of him.

{¶ 8} The video clips and still shot images showed that the shoplifter was wearing black-framed eyeglasses, a black baseball cap, a light blue hooded sweatshirt, jeans, and a distinctive pair of blue and neon green sneakers. Some of the merchandise in the shoplifter's shopping cart could also be seen in the video and still shot images. A royal blue item of clothing, a chainsaw, and several goods packaged in red boxes were in the shopping cart. *See* State's Ex. 10-12 and 14(A)-(C). A large green and white box can also be seen on the bottom rack of the shopping cart. *Id.*

{¶ 9} In addition to pointing out the shoplifter on the security-camera video, Young provided the investigating officers with a partial license plate number of the black Chevrolet Impala in which the shoplifter had driven away. From the license plate information, the officers learned that the vehicle in question was registered to an individual named Troy Yeomans. Approximately 30 minutes after the officers responded to the 9-

1-1 call, Detective Sergeant Christopher Clark of the Darke County Sheriff's Office was dispatched to Yeomans's residence in Gordon, Ohio, to conduct surveillance there. At the time of the surveillance, Det. Sgt. Clark had been provided with the information pertaining to the shoplifter's vehicle and the pictures of the shoplifter that were taken from the security-camera video.

{¶ 10} When Det. Sgt. Clark first arrived at Yeomans's residence, he observed the shoplifter's black Chevrolet Impala parked in the driveway. He also observed a male and female go in and out of the residence multiple times. When Clark first observed the male, he noticed that the male's appearance matched the appearance of the shoplifter. Specifically, the male was wearing a light blue sweatshirt, jeans, and a black baseball cap. Clark took a picture of the male and sent the picture to Lieutenant Ryan Benge of the Greenville Police Department. Upon seeing the picture, Lt. Benge believed that the male was wearing the exact same clothing that the shoplifter had been shown wearing on the security-camera video.

{¶ 11} Lt. Benge thereafter went to Yeomans's residence to assist the surveillance. When Benge arrived, he also observed the male in question go in and out of the residence multiple times with a female. However, when Benge observed the male, he noticed that the male had changed into a darker blue sweatshirt that was the same royal-blue color as the item of clothing that was shown in the shoplifter's shopping cart.

{¶ 12} After some time, Lt. Benge and Det. Sgt. Clark observed the male and female drive away in a black Buick. Thereafter, officers from the Darke County Sheriff's Office conducted a traffic stop of the Buick just a few streets away. During the traffic

stop, the male in the vehicle was identified as Mayes. Benge and Clark were present at the traffic stop and observed that, in addition to a black baseball cap, jeans, and the royal blue sweatshirt, Mayes was wearing the same distinctive pair of blue and neon green sneakers that the shoplifter was wearing on the security-camera video.

{¶ 13} Shortly after the traffic stop, officers executed a search warrant at Yeomans's residence. Prior to executing the search warrant, the officers ordered Yeomans out of his residence, and Yeomans complied. When Yeomans exited the residence, the officers quickly realized that Yeomans's physical appearance did not match that of the shoplifter. Lt. Benge specifically observed that Yeomans appeared much heavier than the shoplifter and that Yeomans had darker, more distinctive facial hair.

{¶ 14} At the time of the search, Yeomans also could not move around easily due to his legs and feet being swollen from diabetes. According to Yeomans, the officers executing the search warrant had to let him sit down inside his house during the search because his legs were bothering him. At trial, Yeomans testified that his leg condition had been going on for three or four years, prevented him from working, and caused him to spend most of his time in bed. Yeomans also testified that, at the time of the search, Mayes had been living at his residence for a few weeks and Mayes had asked him to use his black Chevrolet Impala earlier on the day in question. Yeomans also confirmed that only he and Mayes lived at the residence.

{¶ 15} While executing the search warrant at Yeomans's residence, officers discovered a light blue hooded sweatshirt in Mayes's bedroom that matched the

sweatshirt worn by the shoplifter.   *See* State's Ex. 35.   The officers also found several items of Rural King merchandise in the residence that appeared to match the stolen merchandise shown on the security-camera video.   The merchandise included various Milwaukee brand tools packaged in red boxes, i.e., two nail guns, a hammer drill, a high torque impact wrench, a cordless ratchet, and a heated women's jacket kit.   *See* State's Ex. 16, 23-29.   A Husqvarna brand chainsaw, an Xpedition brand crossbow, and the crossbow's packaging (a green and white box) were also discovered at the residence. *See* State's Ex. 16-22.   The officers also discovered black-framed eyeglasses matching those worn by the shoplifter inside the black Chevrolet Impala parked in Yeomans's driveway.   *See* State's Ex. 32.

{¶ 16} At trial, Young reviewed photographs of the merchandise that was recovered from Yeomans's residence and confirmed that the merchandise was from Rural King.   Young also identified a photograph of a price tag on the stolen chainsaw, which Young testified was a Rural King price tag that listed the cost of the chainsaw as $599.99.[1]   He also identified a photograph of a Rural King price tag on the stolen crossbow, which showed that the crossbow cost $799.00.   *See* State's Ex. 21; Trial Tr., p. 114-116.

{¶ 17} The investigating officers identified Mayes as the shoplifter based on the merchandise found at Yeomans's residence and based on Mayes's appearance matching

---

[1] Although the photograph of the price tag on the chainsaw was shown to Young at trial, it was not introduced as evidence and therefore was not admitted as a trial exhibit.   *See* Trial Tr., p. 115 and 237.   Regardless, Young's testimony established that the stolen chainsaw had a Rural King price tag on it and that the price tag listed the cost of the chainsaw as $599.99.

the appearance of the shoplifter shown on the security-camera video. Young, who testified to getting a good look at Mayes outside Rural King, identified Mayes as the shoplifter at a preliminary hearing held by video conference on February 14, 2023, and also at Mayes's trial. At trial, Lt. Benge testified on cross-examination that the procedure used to identify Mayes as the shoplifter was appropriate. Specifically, Benge testified that it had been unnecessary to present Young with a photo lineup of suspects given that Mayes was identified using the security-camera video and was apprehended not long after the theft.

{¶ 18} The defense did not call any witnesses at trial but presented two photographs showing an unidentified individual, presumably Yeomans, inside the residence that was searched. The photographs showed that the individual had darker facial hair and was wearing a black long-sleeved shirt, black pants with white stripes, and black shoes with white stripes. Defense Ex. 1-2. The defense also presented an additional photograph of one of the shoes Mayes was wearing at the time of his arrest. The photograph showed that the shoe was the same distinctive blue and neon green color as the shoes worn by the shoplifter on the security-camera video. Defense Ex. 4.

{¶ 19} After all the evidence was presented at trial, the jury deliberated and found Mayes guilty as charged in the indictment. The trial court thereafter sentenced Mayes to an indefinite term of three to four and one-half years in prison for robbery and a definite term of nine months in prison for theft. Although the trial court and the parties had previously discussed the possibility of merging Mayes's offenses into one conviction for sentencing, the trial court ultimately decided not to merge the offenses and instead

ordered Mayes to serve his two prison terms concurrently for a total term of three to four and one-half years in prison.

{¶ 20} Mayes now appeals from his convictions, raising three assignments of error for review.

## First Assignment of Error

{¶ 21} Under his first assignment of error, Mayes contends that the trial court erred at sentencing by failing to merge his convictions for robbery and theft as allied offenses of similar import under R.C. 2941.25.   We disagree.

### *Standard of Review*

{¶ 22} An appellate court typically reviews a trial court's merger determination de novo.   *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28. However, because Mayes did not object to the trial court's failure to merge his robbery and theft convictions, all but plain error has been waived for appeal on that issue.   *State v. Bailey*, 171 Ohio St.3d 486, 2022-Ohio-4407, 218 N.E.3d 858, ¶ 7, citing *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 28.   Accordingly, we will review the trial court's merger determination for plain error.

{¶ 23} "To establish plain error, [Mayes] must show that an error occurred, that the error was obvious, and that there is 'a reasonable probability that the error resulted in prejudice,' meaning that the error affected the outcome of the trial."   (Emphasis omitted.) *State v. McAlpin*, 169 Ohio St.3d 279, 2022-Ohio-1567, 204 N.E.3d 459, ¶ 66, quoting

*Rogers* at ¶ 22. *Accord Baile*y at ¶ 8. These elements are "conjunctive" meaning "all three must apply to justify an appellate court's intervention." *Bailey* at ¶ 9, citing *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). Intervention by an appellate court for plain error "is warranted only under exceptional circumstances to prevent injustice." *Bailey* at ¶ 8, citing *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶ 24} In the past, this court has stated on various occasions that a trial court's failure to merge allied offenses of similar import at sentencing constitutes plain error. *See e.g., State v. Hodge*, 2d Dist. Montgomery No. 29147, 2022-Ohio-1780, ¶ 44; *State v. King*, 2d Dist. Montgomery No. 29137, 2021-Ohio-4229, ¶ 28; *State v. Shoecraft*, 2d Dist. Montgomery No. 27860, 2018-Ohio-3920, ¶ 56; *State v. Rogers*, 2d Dist. Greene No. 2011-CA-57, 2012-Ohio-4451, ¶ 5; *State v. Fairman*, 2d Dist. Montgomery No. 24299, 2011-Ohio-6489, ¶ 56. More recently, however, we have recognized that the Supreme Court of Ohio has indicated that the failure to merge allied offenses does not automatically constitute plain error. *See, e.g., State v. Morris*, 2d Dist. Montgomery No. 29555, 2023-Ohio-1765, ¶ 24; *State v. Hess*, 2d Dist. Champaign No. 2022-CA-24, 2023-Ohio-3658, ¶ 11, citing *Bailey*.

{¶ 25} In *Bailey*, 171 Ohio St.3d 486, 2022-Ohio-4407, 218 N.E.3d 858, the Supreme Court of Ohio explained that "the law governing the merger of allied offenses is dependent on the specific facts of each case[,]" and that the allied offense analysis "can lead to exceedingly fine distinctions" since it "turns on an analysis of the facts[.]" (Citations omitted.) *Id.* at ¶ 16 and ¶ 11. With that in mind, the Supreme Court held that

even if the trial court in *Bailey* had erred by failing to merge the offenses in question, "the facts of the case indicate[d] that such an error was not obvious" and therefore did not amount to plain error. *Id.* at ¶ 14-16. Accordingly, *Bailey* indicates that "the proper standard is not that failure to merge allied offenses 'is' plain error[,]" but rather it " 'may' be plain error, depending on the circumstances." *Morris* at ¶ 27.

*Allied Offense Analysis*

{¶ 26} The Double Jeopardy Clause of the United States Constitution protects against multiple punishments for the same criminal conduct. *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 10. When a defendant's conduct supports multiple offenses, sentencing courts apply the allied offense analysis in R.C. 2941.25 to determine whether the offenses merge or whether the defendant may be convicted of separate offenses.

{¶ 27} R.C. 2941.25 provides that:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such

offenses, and the defendant may be convicted of all of them.

**{¶ 28}** " '[W]hen determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions * * *: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation?' " *State v. Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266, ¶ 12, quoting *Ruff* at ¶ 31. " 'An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.' " *Id.*

**{¶ 29}** Offenses are committed separately within the meaning of R.C. 2941.25(B) if "one offense was complete before the other offense occurred, * * * notwithstanding their proximity in time and that one [offense] was committed in order to commit the other." *State v. Turner*, 2d Dist. Montgomery No. 24421, 2011-Ohio-6714, ¶ 24. *Accord State v. Margiotti*, 10th Dist. Franklin No. 19AP-469, 2021-Ohio-1826, ¶ 15-16; *State v. Spurrier*, 11th Dist. Lake No. 2020-L-069, 2021-Ohio-1061, ¶ 68. In other words, "when one offense is completed prior to the completion of another offense during the defendant's course of conduct, those offenses are separate acts." *State v. Mooty*, 2014-Ohio-733, 9 N.E.3d 443, ¶ 49 (2d Dist.), citing *Turner* at ¶ 24.

**{¶ 30}** As previously discussed, Mayes claims that his convictions for robbery in violation of R.C. 2911.02(A)(2) and theft in violation of R.C. 2913.02(A)(1) should have merged at sentencing on grounds that they were allied offenses of similar import. The robbery statute provides that: "No person, in attempting or committing a theft offense *or in fleeing immediately after the attempt or offense*, shall * * *[i]nflict, attempt to inflict, or

threaten to inflict physical harm on another[.]" (Emphasis added.) R.C. 2911.02(A)(2). Pursuant to this language, a robbery does not have to be committed during the course of a theft offense, but can also be committed while "fleeing immediately after" a theft offense has occurred. *Id.*

{¶ 31} The theft statute, R.C. 2913.02(A)(1), provides that: "No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * [w]ithout the consent of the owner or person authorized to give consent[.]" Pursuant to this language, "a person need not leave a store in order to complete a theft offense under R.C. 2913.02(A)(1); rather, the person must knowingly obtain or exert control over the merchandise with the intent to deprive the owner of the property without the owner's consent." *State v. Brienzo*, 9th Dist. Medina No. 3209-M, 2001 WL 1475808, *1 (Nov. 21, 2001), citing *State v. Phillips*, 84 Ohio App.3d 836, 619 N.E.2d 29 (11th Dist.1993). "Once a person transports merchandise without payment beyond the checkout points, or in a manner designed to conceal the merchandise, he has exercised 'control' over the merchandise and can be convicted of shoplifting under R.C. 2913.02(A)(1)." *State v. Tirabasso*, 11th Dist. Geauga No. 99-G-2235, 2000 WL 1371475, *1 (Sept. 22, 2000), citing *Phillips* at 840 ("the transportation of merchandise without payment beyond the checkout points, or in a manner designed to conceal the merchandise, constitutes the exercise of 'control' and is clearly the type of action which subsection (A)(1) was designed to prohibit"). *See also State v. Ratkovich*, 7th Dist. Jefferson No. 02-JE-16, 2003-Ohio-7286, ¶ 21 (holding that appellant "completed the theft, *at the latest*, when he exited the doors" of the store

(Emphasis added.)).

{¶ 32} Based on the foregoing and considering the evidence presented at trial, we find that the trial court could have concluded that the robbery and theft offenses in question were not allied offenses of similar import because they were committed separately. Specifically, the trial court could have found that the theft offense was completed when Mayes bypassed Rural King's checkout points and walked out of the store's emergency exit with a shopping cart full of merchandise he did not pay for. From that finding, the trial court could have concluded that Mayes's robbery offense was committed separately because it was committed while Mayes was fleeing immediately after he had already completed the theft offense. That is, Mayes had already completed the theft offense when he made the threat of physical harm against Young that formed the basis of the robbery. Indeed, there would have been no basis to charge Mayes with robbery had he committed the theft and fled the scene without reaching into his pocket and threatening Young with a purported gun. Therefore, although the evidence established that the theft and robbery offenses were committed close in time, the trial court could have reasonably concluded that they were committed separately under the allied offense analysis.

{¶ 33} While we see no issue with the foregoing conclusion, even if the trial court had erred by failing to merge Mayes's robbery and theft convictions, we do not find that it would amount to an obvious error that warrants a finding of plain error. The fact that it is arguable that the offenses were committed separately indicates that the trial court did not commit an obvious error by failing to merge the offenses. Therefore, Mayes has failed

to establish plain error with regard to the trial court's merger determination.

{¶ 34} Mayes's first assignment of error is overruled.

**Second Assignment of Error**

{¶ 35} Under his second assignment of error, Mayes contends that his convictions for robbery and theft were against the manifest weight of the evidence.   We disagree.

{¶ 36} "A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive."   (Citation omitted.)   *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12.   When evaluating whether a conviction was against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' "   *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances.   *Martin* at 175.

{¶ 37} In this case, Mayes contends that the jury lost its way and created a manifest miscarriage of justice by relying on Young's identification of him as the shoplifter. Specifically, Mayes claims that Young's identification of him was unreliable since the investigating officers did not provide Young with a photo lineup of suspects.   Mayes also

claims that Young's testimony indicated that Young was uncertain as to whether Mayes was the shoplifter he had encountered on the day in question.

{¶ 38} Upon review, we disagree with Mayes's claim that Young was uncertain as to whether Mayes was the shoplifter. At trial, Young testified that his encounter with Mayes lasted one to two minutes and that he got a good look at Mayes because he came within two or three feet of him. Trial Tr., p. 98. Young also testified that he was "pretty sure" Mayes was the shoplifter and then later testified that he was "a hundred percent sure." Trial Tr., p. 98 and 120. Although "pretty sure" and "a hundred percent sure" express different levels of certainty, those statements by no means indicate that Young was uncertain as to whether Mayes was the shoplifter.

{¶ 39} Regardless, "there is no requirement the defendant be specifically identified as the perpetrator of a crime by a witness testifying in court or during a photo array or lineup to uphold the defendant's conviction." *State v. Knox*, 8th Dist. Cuyahoga No. 107414, 2019-Ohio-1246, ¶ 58, citing *State v. Muhammad*, 8th Dist. Cuyahoga No. 104111, 2016-Ohio-8322, ¶ 23. *Accord State v. Henderson*, 3d Dist. Allen No. 1-18-30, 2018-Ohio-4550, ¶ 26; *State v. Miller*, 11th Dist. Lake No. 2011-L-111, 2012-Ohio-3515, ¶ 53. Rather, " 'direct or circumstantial evidence is sufficient to establish the identity of the accused as the person who committed the crime.' " *Miller* at ¶ 53, quoting *State v. Lawwill*, 12th Dist. Butler No. CA2007-01-014, 2008-Ohio-3592, ¶ 11, citing *State v. Irby*, 7th Dist. Mahoning No. 03 MA 54, 2004-Ohio-5929, ¶ 16-21. *Accord Knox* at ¶ 58.

{¶ 40} Here, even without Young's identification of Mayes, there was a plethora of circumstantial evidence from which the jury could have determined that Mayes was the

shoplifter. For example, the fact that Mayes was apprehended not long after the theft/robbery wearing most of the same clothing as the shoplifter, including the shoplifter's distinctive blue and neon green sneakers, supported finding that Mayes was the shoplifter. Mayes was also wearing a sweatshirt that was the same royal-blue color as the item of clothing that could be seen in the shoplifter's shopping cart on the security-camera video. In addition, officers found various items of merchandise from Rural King in the residence where Mayes lived—merchandise that matched the stolen merchandise shown in the shoplifter's shopping cart. The evidence also established that only Mayes and Yeomans lived at the residence where the Rural King merchandise was found and that Yeomans did not look like the shoplifter. Furthermore, because the shoplifter was shown running from Young on the security-camera video, the jury could have reasonably concluded that Yeomans was not the shoplifter given that Yeomans testified to having a leg condition that made it difficult for him to move around. To top it off, a light blue hooded sweatshirt matching the sweatshirt worn by the shoplifter was found in Mayes's bedroom.

**{¶ 41}** Contrary to Mayes's claim otherwise, we do not find that the lack of a photo lineup weighed against his convictions. Lt. Benge testified that a photo lineup was unnecessary given that Mayes was identified using the security-camera video and was apprehended wearing the same clothes as the shoplifter not long after the theft/robbery. Under similar circumstances, courts have found that the failure to identify the appellant using a photo lineup did not weigh against the appellant's conviction. *See Henderson*, 3d Dist. Allen No. 1-18-30, 2018-Ohio-4550, at ¶ 26; *State v. Brown*, 7th Dist. Mahoning

No. 16 MA 0059, 2017-Ohio-7704, ¶ 8, 30-31.

{¶ 42} Mayes also argues that his conviction for robbery was against the manifest weight of the evidence because Young's testimony about him reaching into his sweatshirt pocket and saying that he had a gun lacked credibility. Mayes claims that this testimony lacked credibility because the evidence established that Young had continued to follow him despite allegedly being threatened with a gun. Mayes also claims that Young's testimony lacked credibility because the security-camera video did not show him reaching into his sweatshirt pocket and because a gun was never found on his person or at his residence.

{¶ 43} We note that the security-camera video showing Young's interaction with Mayes was taken at a distance and only showed a portion of their interaction. *See* State's Ex. 14(B)-(C). Although Mayes could not be seen reaching into his sweatshirt pocket and was never found with a gun, it was up to the jury to decide whether to believe Young's testimony about Mayes's threatening statement and gesture.

{¶ 44} It is well established that " 'the fact finder is free to believe all, part or none of the testimony of each witness appearing before it.' " *State v. Lewis*, 2d Dist. Champaign No. 2023-CA-24, 2024-Ohio-756, ¶ 12, quoting *State v. Petty*, 10th Dist. Franklin Nos. 11AP-716, 11AP-766, 2012-Ohio-2989, ¶ 38. (Other citation omitted.) "The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts primarily to resolve." *Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, at ¶ 15, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). "The trier of fact is in the best position to consider inconsistencies, along with the

witnesses' manner and demeanor, [to] determine whether the witnesses' testimony is credible." *Lewis* at ¶ 12, citing *Petty* at ¶ 38. (Other citation omitted.) "Consequently, an appellate court must give great deference to the fact finder's determination of the witnesses' credibility." *Id.* "This court will not substitute its judgment for that of the trier of fac[t] on the issue of witness credibility unless it is patently apparent that the factfinder lost its way." (Citation omitted.) *State v. Bradley*, 2d Dist. Champaign No. 1997-CA-3, 1997 WL 691510, *4 (Oct. 24, 1997). " 'Mere disagreement over the credibility of witnesses is not [a] sufficient reason to reverse a judgment.' " *Lewis* at ¶ 12, quoting *Petty* at ¶ 38, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24.

**{¶ 45}** Because the jury returned a guilty verdict on the robbery charge, we presume the jury found Young's version of events credible and believed that Mayes had threatened Young by reaching into his sweatshirt pocket and telling Young that he had a gun. It is not patently apparent that the jury lost its way by finding Young's testimony credible. Accordingly, we see no reason to disturb the jury's finding on that matter.

**{¶ 46}** After reviewing the entire record and weighing all the evidence and reasonable inferences, we find that the jury did not clearly lose its way and create a manifest miscarriage of justice by finding Mayes guilty of robbery and theft. Indeed, there was an abundance of evidence establishing that Mayes was the shoplifter shown on Rural King's security-camera video, and the jury was free to believe Young's testimony about Mayes threatening him with a gun. Accordingly, Mayes's convictions for robbery and theft were not against the manifest weight of the evidence.

{¶ 47} Mayes's second assignment of error is overruled.

**Third Assignment of Error**

{¶ 48} Under his third assignment of error, Mayes contends that he was denied his right to a fair and impartial jury due to the trial court's summoning individuals from the courthouse on the day of trial to be a part of the jury array without the parties' consent. Mayes suggests that this conduct violated R.C. 2313.11, which provides as follows:

(A) When, by reason of challenge or other cause, enough jurors to make up the panel, either of the grand or petit jury, are not present, or if the array is set aside, upon order of the court the sheriff or commissioners of jurors shall immediately summon as many persons having the qualifications of a juror as, in the opinion of the court, are necessary. The summoned jurors shall appear forthwith or at such times as the court fixes.

(B) No person known to be in or about the courthouse shall be summoned without the consent of both parties.

{¶ 49} "Crim.R. 24(F) states that either side 'may challenge the array of petit jurors on the ground that it was not selected, drawn or summoned in accordance with the law.' " *State v. Freeman*, 2d Dist. Greene No. 2020-CA-33, 2021-Ohio-734, ¶ 14, quoting Crim.R. 24(F). *Accord State v. Walker*, 2d Dist. Clark No. 2008-CA-32, 2009-Ohio-1936, ¶ 13. However, the rule also provides that such "[a] challenge shall be made before the examination of the jurors * * * and shall be tried by the court." Crim.R. 24(F).

{¶ 50} The failure to timely challenge the jury array waives the issue for appeal.

*Freeman* at ¶ 15, citing *State v. Curry*, 2d Dist. Greene No. 2012-CA-50, 2014-Ohio-3836, ¶ 30. Several appellate courts, including this one, have overruled assignments of error challenging the jury array where the challenge was either untimely raised in the court below or raised for the first time on appeal. *See, e.g., Walker* at ¶ 13-14; *Curry* at ¶ 30; *State v. Hopkins*, 2018-Ohio-1864, 112 N.E.3d 98, ¶ 126 (2d Dist.); *State v. Atkinson*, 9th Dist. Lorain No. 19CA011481, 2020-Ohio-3522, ¶ 21; *State v. Davis*, 7th Dist. Columbiana No. 96-CO-44, 1999 WL 1050092, *9 (Nov. 19, 1999).

**{¶ 51}** In this case, the only information in the record pertaining to Mayes's jury array argument is the following statement that was made by the trial court prior to voir dire:

> A number of your fellow jurors didn't show up, and so my court administrator and court bailiff were on the phone trying to contact some local people here. And the last three individuals that came in we basically pulled off the street.

Trial Tr., p. 7.

**{¶ 52}** The three prospective jurors "pulled off the street" were Prospective Juror Nos. 31, 32, and 33. *See* Trial Tr., p. 36-42, and Court Ex. 1. Although Prospective Juror No. 31 indicated that she worked in the courthouse, it is unclear from the record whether she and the other two prospective jurors at issue were "in or about the courthouse" at the time they were summoned to be part of the jury array. Regardless, the record establishes that neither party objected to the trial court's summoning the three prospective jurors at issue. It is also clear from the record that Mayes is challenging the

prospective jurors' presence on the jury array for the first time on appeal. Because Mayes failed to timely challenge the composition of the jury array in the trial court, any issue pertaining to the jury array has been waived.

{¶ 53} Even if Mayes had not waived his ability to challenge the jury array, his claim that the unorthodox recruitment of Prospective Juror Nos. 31, 32, and 33 denied him the right to a fair and impartial jury lacks merit, because the record indicates that the prospective jurors in question were excused after voir dire and thus were not seated as jurors for Mayes's trial. *See* Trial Tr., p. 56-57. Mayes fails to explain and we fail to see how the prospective jurors' presence on the jury array impacted the fair and impartial nature of the jury that was empaneled to hear Mayes's case. As noted by the Supreme Court of Ohio, "any claim that the jury was not impartial is not focused on the juror[s] excused * * *, but rather is focused on the jurors who ultimately sat." *State v. Broom*, 40 Ohio St.3d 277, 288, 533 N.E.2d 682 (1988), citing *Ross v. Oklahoma*, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988).

{¶ 54} Mayes's third assignment of error is overruled.

## Conclusion

{¶ 55} Having overruled all three assignments of error raised by Mayes, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, J. and HUFFMAN, J., concur.